FILED

SEP 3 0 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

IGNACIO GOMEZ,                        §
            Petitioner,               §
                                      §
v.                                    §
                                      §          EP-02-CA-267-PRM
JANIE COCKRELL, Director, Texas       §
Department of Criminal Justice,       §
Institutional Division,               §
            Respondent.               §

## MEMORANDUM OPINION AND ORDER

Petitioner Ignacio Gomez ("Gomez") filed this federal habeas corpus petition pursuant to

28 U.S.C. § 2254, in which he attacks his otherwise final state capital murder conviction and

death sentence for the 1996 murders of three teenagers in El Paso County, Texas.  After careful

consideration, the Court concludes that Gomez' claims are either procedurally barred or without

merit under the Antiterrorism and Effective Death Penalty Act of 1996.  Accordingly, the Court

concludes that he is not entitled to federal habeas corpus relief, nor is he entitled to a Certificate

of Appealability.

## I.    FACTS AND PROCEDURAL HISTORY

*A.  Facts of the Offense*

The following facts were elicited at Gomez' trial.  Gomez lived outside El Paso, Texas in

an unplanned residential community composed of widely scattered site-built and manufactured

homes.[1]  Access from the highway was mainly by dirt road.[2]  Members of Gomez' extended

---

[1] *See* Reporter's Record from Petitioner's Trial, *State of Texas v. Ignacio Gomez*, Cause no.
960D10271 (hereinafter, "RR") at Vol. 27 of 35,  testimony of Joel Guillen, pp. 44-5.

[2] *See id.*, pp. 44-5.

1

family lived on the same property or nearby, including his brothers Roberto, Jose Luis, and Juan;

his mother Maria; and brother-in-law, Joel Guillen ("Guillen").[3]

On November 22, 1996, a Friday evening, Roberto and Guillen were on their way to Jose

Luis' house, driving Roberto's white Ford Bronco.[4]  They encountered a bonfire party at the

home of John Greer ("Greer"), which was located about one block away from the Gomez

property.[5]  At the party were Greer, his teenage son Jessie, and a number of Jessie's friends,

including Luis Morales, twins Matthew and Michael Meredith, and Tolbert ("Toby") Hathaway.[6]

---

[3]See RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 56-7.  The Gomez family had three small homes on a single plot of land.  See id.  Two of these homes were occupied individually by Maria and Roberto.  See id.  Gomez either lived in the third home or nearby with his wife and children.  See id.

[4]See RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 42-7.  Guillen testified against Gomez under a grant of immunity from the El Paso District Attorney's Office.  See RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 38-9; see also RR at Vol. 34 of 35, State's Exhibit 1, pp. 1-3.  The jury was charged, however, that Guillen "was an accomplice, if any offense was committed."  RR at Vol. 30 of 35, Charge of the Court, p. 20.  The trial court instructed the jury that it could not find Gomez guilty upon Guillen's testimony unless it believed that: (1) Guillen's testimony was truthful; (2) it showed that Gomez was guilty as charged in the Indictment; and (3) there was other evidence beyond Guillen's testimony that tended to connect Gomez with the commission of the offense.  See id.  The trial court further instructed the jury that it must then find, from all the evidence, that Gomez was guilty beyond a reasonable doubt.  See id.
  Guillen was also granted immunity from prosecution in exchange for his truthful testimony against Jose Luis Gomez in State of Texas v. Jose Luis Gomez, cause no. 960D10305.  See RR at 34 of 35, State's Exhibit 1, p. 1.  The exact charges against Jose Luis Gomez and outcome of that case are not stated in the record before this Court.
  Roberto Gomez did not testify at Ignacio Gomez' trial, and according to Gomez, was not prosecuted for capital murder.  See Petitioner's Brief in Support of Petition for Writ of Habeas Corpus (hereinafter, "Pet'r Br."), docket entry no. 16, p. 4, n.3.

[5]See RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 46-7; testimony of John Greer, pp. 195-9.

[6]See RR at Vol. 27 of 35, testimony of John Greer, pp. 197-8.  Gomez states that the Meredith twins were sixteen years old and their friend, Toby Hathaway, was eighteen.  See Pet'r Br., p. 3.  The Court notes, however, that the portion of the Reporter's Record to which Gomez cites does not mention the victims' ages.  See id. (citing RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza,  p. 275).  The Court is aware of only two, albeit conflicting, references in the record to Toby's Hathaway's age.  Witness Francisco Silva, Sr. agreed with the prosecutor that Hathaway was nineteen years old at the time of his death.  See RR at Vol. 27 of 35, testimony of Francisco Silva, Sr., p. 211.  The medical examiner's report, however, states that Hathaway was eighteen years old.  See RR at Vol. 30 of 30, State's Exhibit 132, p. 1.  The medical examiner's reports for Matthew and Michael Meredith indicated that they were

For reasons which were disputed at trial, a minor scuffle ensued between Luis Morales and the two men.[7] When Roberto and Guillen returned to the family's property afterward, they related the incident to Gomez, who told them not to worry because they had done nothing wrong.[8]

Later that evening, someone broke two windows at Maria Gomez' house.[9] The next morning, Roberto and Guillen went to the Greer residence and accused Jessie of the vandalism.[10] Early that afternoon, Francisco Silva, an area resident, saw Roberto and Juan Gomez harassing Toby Hathaway by the side of the road.[11] Silva intervened to prevent a fight.[12] When he did,

---

sixteen years old. *See* RR at Vol. 30 of 30, State's Exhibits 150 & 152, respectively, p.1.

The Court also notes that Respondent states Toby Hathaway's full name as *Robert* Hathaway. *See* Respondent Cockrell's Answer and Motion for Summary Judgment (hereinafter, "Resp't Ans."), docket entry no. 20, p. 1. In the record, however, Hathaway's first name is repeatedly stated to be Tolbert. *See, e.g.*, RR at Vol. 27 of 35, testimony of John Greer, p. 198; testimony of Det. Onesimo Esparza, p. 257; RR at Vol. 35 of 35, State's Exhibit 132 (Medical Examiner's Autopsy Report – Tolbert Hathaway), p. 1.

[7]Guillen testified that Roberto heard someone at the party shout "los culos" (roughly translated, "the assholes") at them as they passed. *See* RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 43, 47-53. Angered, Roberto retaliated by making a U-turn back towards the party and "making doughnuts" in the dirt nearby. *See id.*, p. 43. According to Guillen, the partygoers began throwing bottles at the Bronco, the Bronco stalled, and a crowd started toward them. *See id.*, pp. 47-53. One youth, whom Greer identified at trial as Luis Morales, reached them and the minor scuffle alluded to above followed. *See* RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 50-1; testimony of John Greer, p. 200. Shortly thereafter, Roberto was able to restart the Bronco. *See* RR at Vol. 27 of 35, testimony of Joel Guillen, p. 52. He and Guillen then retreated to Gomez' house. *See id.*, pp. 53-4.

Greer testified that the Bronco began making doughnuts in the dirt before the partygoers yelled at the driver. *See* RR at Vol 27 of 35, testimony of John Greer, p. 199. When the Bronco pulled away, he made his son and his son's friends stay at the bonfire. *See id.*, p. 201-02.

[8]*See* RR at Vol. 27 of 35, testimony of Joel Guillen, p. 54.

[9]*See* RR at Vol. 28 of 35, testimony of Det. Onesimo L. Esparza, p. 41 (reading from the November 25, 1996 statement of Ignacio Gomez); *see also* RR at Vol 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), pp. 1-2 (quoted in relevant part *ante* note 96).

[10]*See* RR at Vol. 27 of 35, testimony of John Greer, pp. 202-04.

[11]*See* RR at Vol. 27 of 35, testimony of Francisco Silva, Sr., pp. 206-10.

[12]*See id.*

Toby complained that Roberto had beaten up his friend Luis Morales the previous night.[13]
Roberto countered by saying that someone had broken the windows at his mother's house that
same night, and that he was going to get whomever had done it.[14]  Silva advised Roberto to
report the incident to the police department, and then drove Toby home.[15]

Gomez came home between 4 and 5 p.m. that afternoon, passing en route three teenagers
whose names he did not know.[16] Upon his arrival, his mother told him about the broken
windows.[17]  Gomez became very upset.[18]  He retrieved his fully-loaded .38 caliber revolver and
extra ammunition.[19]  He wrapped the revolver and extra bullets in a white T-shirt and hid it in his
truck.[20]  He then began cruising the neighborhood, looking for the person who had vandalized his
mother's house.[21]  He soon encountered his brothers Roberto and Jose Luis, as well as his
brother-in law Guillen, working on a dune buggy.[22]  He asked them if they knew who had broken

---

[13]See id.

[14]See id.

[15]See id.

[16]See RR at Vol. 28 of 35, testimony of Det. Onesimo Esparza, p. 41 (reading from Gomez's
November 25, 1996 statement to Det. Esparza and Det. Daniel Diaz); RR at Vol 34 of 35, State's Exhibit
3 (November 25, 1996 Statement of Ignacio Gomez), pp. 1-2.

[17]See RR at Vol. 27 of 35, testimony of Joel Guillen, p. 60; RR at Vol 34 of 35, State's Exhibit 3
(November 25, 1996 Statement of Ignacio Gomez), pp. 1-2.

[18]See RR at Vol. 27 of 35, testimony of Joel Guillen, p. 60; RR at Vol 34 of 35, State's Exhibit 3
(November 25, 1996 Statement of Ignacio Gomez), p. 1.

[19]See RR at Vol 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), p.
1.

[20]See id.

[21]See id.

[22]See id.

the windows.[23]  Gomez asked Roberto if he wanted to go to the store.[24]  Roberto said yes, and

Guillen said that he and Jose Luis would go with them.[25]  Gomez drove them to the Country Boy

Store on Montana Road, but did not stop.[26]  Instead, he drove slowly through the store's parking

lot, an adjacent gas station, and nearby trailer park, all the while looking around him.[27]  While

they were driving through the trailer park, Gomez showed the others that he had a gun, wrapped

in a rag, hidden in the cab.[28]  Gomez then made a U-turn back onto Montana and shortly

thereafter, turned eastbound onto a dirt road.[29]

Soon thereafter, they saw three teenagers, later identified as Michael Meredith, Matthew

Meredith, and Toby Hathaway, walking westbound along the roadside.[30]  Gomez turned on the

---

[23]*See* RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 56-9.  According to Gomez' statement, he also wanted to know if they knew the names of the three teenagers. See RR at Vol. 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), pp. 1-2; *see also ante* note 96.

[24]*See id.*, p. 61.

[25]*See id.*

[26]*See id.*, pp. 63-7.

[27]*See id.*, pp. 67-8.

[28]*See id.*, pp. 84-5.  In his statement to Detective Daniel Diaz, Gomez stated that his companions did not know that he had a gun with him until the shooting started.  *See* RR at Vol. 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), p. 2.

[29]*See id.*, pp. 67-71.  Respondent identifies the dirt road where the killings occurred as Round Dance Road, *see* Resp't Ans., p. 7 (citing RR at Vol. 27 of 35, testimony of Joel Guillen, p. 73).  The Court notes that the portion of the record to which Respondent refers describes only "that dirt road" and does not identify it by name.  *See* RR at Vol. 27 of 35, testimony of Joel Guillen, p. 73.  In his statement to Detective Daniel Diaz, Gomez identified the road as "Square Dance Rd."  *See* RR at Vol. 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), p. 2.   An empty lot separated Robert Harris' property from this road.  *See* RR at Vol. 27 of 35, testimony of Robert Harris, pp. 221-2.  A trial, Harris identified it as "Round Dance Road."  *See id.*  Detective Onesimo L. Esparza testified that the scene of the killings was located near the intersection of Round Dance Rd. and Square Dance Rd.  *See* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, p. 247.

[30]*See* RR at Vol. 27 of 35, testimony of Joel Guillen, p. 74.

truck's bright lights to see more clearly, and Roberto identified the three individuals as "the guys that broke the windows."[31]  Jose Luis and Roberto left the truck and began fighting with the teenagers.[32]  Guillen joined in.[33]  At this point, Jose Luis, Roberto, and Guillen were each engaged in one-on-one fistfight or wrestling match against one of the teenagers.[34]  Initially, Gomez just paced and watched.[35]  However, after about a minute, Guillen heard a gunshot, followed immediately by the exclamation, "Shit, it hit him."[36]

Guillen released his opponent, who ran to the teenager who had been shot.[37]  The third teenager also went to the side of the individual who had been shot.[38]  Several more shots rang out.[39]  Guillen heard Gomez say, "Pues que no chingen mi jefa" and saw him holding the gun that he had showed them earlier.[40]  Two of the teenagers were on the ground, mortally wounded, and the third was running for cover.[41]  Gomez returned to the truck for more bullets and reloaded the

---

[31]See id.

[32]See id., p. 77.

[33]See id., p. 77-8; RR at Vol 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), p. 2.

[34]See id., pp. 78-9.

[35]See id., p. 82.

[36]See id., p. 83-5.

[37]See id., p. 85.

[38]See id., p. 86.

[39]See id., pp. 86-7.

[40]See RR at Vol. 27 of 35, testimony of Joel Guillen, p. 91.  Guillen translated this phrase as, "So you see, nobody fucks around with my mother."  See id.

[41]See id., pp. 92-3.

gun.[42]  He ordered Guillen to get the boy who was running away.[43]  Guillen refused but Jose Luis complied, forcing him back to where Gomez and the other victims were.[44]  Guillen testified that he did not want to watch, but he heard a single shot coming from the area of Gomez, Jose Luis, and the third victim.[45]  He also testified that he never saw Gomez release the gun.[46]  All told, he reported hearing approximately 12 gun shots.[47]  Frightened by Gomez' actions and fearing for their own safety, Guillen and Roberto began running, too.[48]  They returned later to the scene, where they observed Gomez and Jose Luis loading the bodies into the back of Gomez' truck.[49]  Gomez still had the gun in his hand and ordered Roberto and Guillen to help them.[50]

When all three bodies were loaded into the truckbed, Gomez drove everyone several miles out to an unpopulated desert area on Fort Bliss, located northeast of the murder scene.[51]

---

[42]*See id.*, pp. 93-4.  Guillen testified that he grabbed Gomez' arm and hand holding the gun, pleading with him to stop and let them call an ambulance.  *See id.*  According to Guillen, Gomez refused, saying that he did not want to let anyone escape, and ordered Guillen to get the boy who was running away.  *See id.*

[43]*See id.*, p. 95

[44]*See id.*, pp. 95-6.  According to Guillen, the third boy begged for his life as Jose Luis forced him back to Gomez and the other victims.  *See id.*

[45]*See id.*, p. 97.

[46]*See id.*, p. 99.

[47]*See id.*

[48]*See id.*, p. 100.

[49]*See id.*, pp. 103-4.

[50]*See id.*, p. 104.

[51]*See id.*, pp. 106, 108-110.  According to Guillen, as they transported the bodies into the desert, Gomez remarked that "there were still a few more guys missing," apparently referring to others that he believed to have been involved in breaking his mother's windows.  *See id.*, p. 109.

The bodies were unloaded onto the ground.[52]  Gomez, thinking that one of the victims was still

alive, kicked him in the face about six times.[53]  Gomez then removed the victims' clothes and

threw them into the truck.[54]  Gomez, Roberto, Jose Luis, and Guillen returned to Gomez' house,

where Gomez burned the victims' clothing in a 55-gallon can.[55]  Roberto left after the clothes

were burned.[56]

Gomez stashed the gun inside a chicken coop on his property, collected some shovels and

put them in his truck.[57]  Gomez, Jose Luis, and Guillen returned to where they had dumped the

bodies.[58]  Once there, Gomez and Guillen dug a shallow grave and then Gomez and Jose Luis

pulled the bodies into it.[59]  At Gomez' direction, Guillen poured a 50 lb. bag of "cal" over the

bodies.[60]  Gomez and Jose Luis then covered the bodies with dirt and Guillen covered their tracks

---

[52]*See id.*, pp. 111-2.

[53]*See id.*, pp. 112-3.

[54]*See id.*, p. 114.

[55]*See id.*, pp. 114-5.

[56]*See id.*, p. 116.

[57]*See* RR at Vol. 34 of 35, November 25, 1996 Statement of Ignacio Gomez, p.2,

[58]*See* RR at Vol. 27 of 35, testimony of Joel Guillen, p. 120. Guillen testified that Gomez was already angry that his brother Roberto had left the group, suspecting that he might talk about the murders. *See id.*, pp. 116-7.  With Gomez already as angry as he was with his own brother, Guillen said that he, only a brother-in-law, was afraid not to go, for fear of angering Gomez further.  *See id.*, p. 116-7.

[59]*See id.*, pp. 120-1.  Guillen testified that Jose Luis looped a garden hose around the victims' necks and used the hose to pull the bodies into the grave.  *See id.*

[60]*See id.*, pp. 123-4.  When asked by prosecutor if "cal" was lime (calcium hydroxide or "quicklime"), Guillen testified that did not know exactly what the substance was.  *See id.*  He was able to describe it only as some kind of "dry white cement," but testified that Gomez and Jose Luis brought it along because they wanted to "burn" the bodies.  *See id.*

with a brushy plant.[61]  Gomez, Jose Luis, and Guillen returned to Maria Gomez' house, where they parted company.[62]

Robert Harris, whose home is located approximately 500-600 feet from where the victims were shot,  testified that at 6:45 p.m. on November 23, 1996,  he was at home having dinner with his wife when he heard two sets of gunshots.[63]  The first was a series of four shots, followed by a pause of about a minute.[64]  Then he heard a second series of six shots, which he described as one shot, followed by a short pause, then four more shots in quick succession, followed by a final shot.[65]  About five minutes after hearing the last shot, Harris saw tail lights of a vehicle heading northeast, off road and through the desert.[66]

The following facts were also established at trial.  Earlier on the day of the murders, at about 3 p.m., Matthew and Michael Meredith decided to walk to Toby Hathaway's house, which was located some two to three miles away.[67]  Their mother expected them back before their 11 p.m. curfew that night and assumed that Toby's father would drive them home.[68]

When her sons did not return by their curfew, Mrs. Meredith drove to Toby's house to

---

[61]See id., pp. 126-8.

[62]See id.

[63]See RR at Vol. 27 of 35, testimony of Robert Harris, p. 226.

[64]See id., pp. 226-7.

[65]See id., p. 227.

[66]See id., pp. 228-9.

[67]See RR at Vol. 27 of 35, testimony of Mary Meredith, p. 234.

[68]See id., p. 235.

look for them.[69]  Eva Hathaway, Toby's mother, told Mrs. Meredith that all three boys had left her house at about 6:30 p.m., headed for the Meredith's place.[70]  Mrs. Hathaway and Mrs. Meredith went looking for their sons.[71]  Unable to find them, Mrs. Meredith called the Sheriff's Department at around midnight.[72]  Because the Sheriff's Department would not take a missing person's report until after 24 hours had elapsed, the women continued to look for their sons on their own until about 2 a.m.[73]

The next morning, the two families and their friends continued to look for the missing teenagers.[74]  Eventually, Danny Hathaway found Michael Meredith's baseball cap, several bullets, and blood along the side of Round Dance Road north of Montana Road.[75]  Danny kept people away from the evidence until the Sheriff's Department arrived.[76]

Detective Onesimo L. Esparza ("Esparza") was called to the scene at approximately 4 p.m.[77]  After speaking to the families, he ensured that the crime scene had been secured.[78] Esparza observed the following details at the crime scene: Michael Meredith's blue baseball cap;

---

[69]*See id.*, pp. 235-6.

[70]*See id.*, p. 236.

[71]*See id.*

[72]*See id.*

[73]*See id.*, pp. 237-8.

[74]*See id.*, pp. 238-9.

[75]*See id.*, p. 239.  Danny Hathaway's relationship to Toby Hathaway is not clearly stated in the record.

[76]*See id.*, p. 240.

[77]*See* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza. p. 247.

[78]*See id.*, pp. 249-50.

a comb belonging to one of the victims; a piece of paper with the name "Matt Meredith" on it; and blood on the ground.[79]  He also observed marks on the ground consistent with several different scuffles having occurred, and two live rounds of ammunition.[80]  He testified that, from his experience, the unspent rounds could have arrived there as the result of a hasty attempt to reload a weapon.[81]  Esparza also noted two sets of shoe impressions – one set heading east to west, and the other heading west to east.[82]  He explained at trial that the distance between the shoe prints suggested that the individual who made them had been running, had been stopped, engaged in a scuffle that came to an abrupt halt, and had then been brought back to where he started from.[83]  Esparza also observed two sets of new drag marks heading from south of Road Dance Road toward the road, with a trail of blood between them.[84]

While still at the murder scene, Esparza received a call from police dispatch advising him that two men had arrived at the station and wanted to provide information on the disappearance of three boys.[85]  The two men were Roberto Gomez and Joel Guillen.[86]  They explained what had happened and gave detailed information about Gomez' involvement in the offense.[87]  At trial,

---

[79]See id., pp. 250-1.

[80]See id., pp. 251-3.

[81]See RR at Vol. 28 of 35, testimony of Det. Onesimo L. Esparza, pp. 69-70.

[82]See id., pp. 71-2.

[83]See id., p. 68; RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, pp. 250-1, 254-5.

[84]See RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, pp. 250-1.

[85]See id., p. 258.

[86]See id., p. 259.

[87]See id., pp. 259-60.

Esparza testified that the physical evidence he had observed at the murder scene was consistent with Guillen's explanation of events.[88]

Roberto and Guillen showed Esparza where the boys' bodies were buried.[89] Esparza found tire marks at the graveside, but no shoeprints.[90] He immediately secured the scene, called for an evidence technician, and placed Gomez' home under surveillance.[91] Esparza returned to the stationhouse with Roberto and Guillen to take their formal statements.[92] When excavation of the gravesite corroborated their statements in all relevant details (*i.e.*, location, method of burial, the bodies being unclothed except for socks and underwear), Esparza directed Detective Daniel Diaz to obtain an arrest warrant for Gomez.[93]

Gomez was arrested, given a *Miranda* warning and taken to the stationhouse on Monday morning, November 25, 1996.[94] His truck was impounded.[95] At the stationhouse, Gomez was given another *Miranda* warning, after which he confessed, told where he had hidden the murder weapon, and consented to a search of his house and truck.[96]

---

[88]*See* RR at Vol. 28 of 35, testimony of Det. Onesimo L. Esparza, p. 67.

[89]*See* RR at Vol. 27 of 35, testimony of Joel Guillen, pp. 130-3; testimony of Det. Onesimo L. Esparza, pp. 260, 267.

[90]*See* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, p. 268.

[91]*See id.*, pp. 269-70.

[92]*See id.*, p. 275.

[93]*See* RR at Vol. 28 of 35, testimony of Det. Onesimo L. Esparza, pp. 115-7, 120; Vol. 27 of 35; testimony of Det. Onesimo L. Esparza, pp. 276-7.

[94]*See* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, p. 279.

[95]*See* RR at Vol. 28 of 36, testimony of Det. Onesimo L. Esparza, pp. 208-9.

[96]*See* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, pp. 276-7. The relevant portion of Gomez' statement, edited slightly for typographical errors and punctuation, follows:

On Saturday, November 23, 1996, around 4 or 5 p.m., I was at my mother's house located at 13370 Soleen Rd., with my wife, Lorena, and my three baby girls. I saw two front windows to my mom's house, broken. This got me very upset because I was told by my mom that someone unknown had broken the two windows last night, Friday, November 22, 1996, during the time she was asleep around 3 a.m. My mother said she had gotten very scared. This got me more mad because I love my mother very much and I don't want to see her hurt by anyone. I then got into my primer gray Chevrolet Blazer, 1982 model, and drove to my house located a[t] 14960 Jacob Kuechler to get my .357 caliber revolver, six shots, dark colored with brown pistol grips, brand name unknown. The handgun has some sort of inscription on the handles with the name of "BLACK." It has other words which I can't remember the rest. The gun was fully loaded with six .38 caliber bullets, unknown brand name. The gun and about (14) fourteen other .38 cal. bullets, were wrapped in a white T-shirt. I had them hidden in an old tire near my chicken coop. I got my gun and hid it in my truck. I went cruising around the neighborhood where my mother lives, looking for the guys that had broken my mother's windows[.] As I drove, I ran into my brothers, Roberto and Jose Luis Gomez, and my brother in law, Joel Guillen. The three were in Roberto's dune buggy. I asked them to identify three guys I had seen walking on Square Dance Rd. They ro[de] the dune buggy to my mom's house and the three of them got into the Chevy Blazer. Neither of them had any knowledge I owned a gun. They also did not know that I had the mentioned gun on me or with me. The three guys which I wanted my brothers, Roberto and Jose Luis and Joel to identify were by that time walking west on Round Dance Rd. Roberto saw the three guys and told me that they were the ones he (Roberto) and Joel, had a fight with Friday[,] November 22, 1996. Roberto also told me that among the three was the person who had broken my mother's windows. This person was dressed in dark clothes. I didn't pay any attention to the other two person's clothing. I was still very upset. I then parked my Blaze next to them towards the opposite of my Blazer's direction. My Blazer was facing east on Round Dance Rd. and the three other guys were to the passenger's side of my Blazer. My brother[s], Roberto and Jose Luis and Joel got out of my Blazer and started fighting with the three guys. As they fought, I got my gun from underneath my seat on the front driver[']s side[.] I then got out of the Blazer and walked over to where the person dressed in dark clothes was at. I don't remember who he was fighting with. This guy is the same one Roberto had told me he fought with the previous night and the one who had broken my mother's window. I got about six feet from him and discharged one round from my .357 cal. handgun[,] hitting him in the forehead. The guy immediately fell to the ground. My brothers and Joel started yelling at me, asking me why I had shot him. The three started running away. The other two guys were next to the first guy I had shot. I then pointed the gun at the second guy and shot him in the body. I then pointed the gun at the third guy and I fired one round at him and shot him in the chest. Then I yelled at Joel and my two brothers to stop running because we were all involved in the killing of the three guys. As I was yelling at them, I also pointed the gun at them to scare them in order for them to help me get rid of the three bodies. I then continued discharging the rest of the rounds at the three bodies as they la[y] on the ground close to eachother, maybe two or three feet apart. I reloaded my gun with six more rounds and fired them at the three bodies as they still la[y] on the ground. I want to make a correction concerning the last guy I killed. This particular guy attempted to run from me and I caught up to him since he didn't run too far. At gun point I demanded for

13

Gomez' written statement corroborated Guillen's testimony in relevant part.[97]

Shelley Bennet, a crime scene technician for the El Paso County Sheriff's Office,

photographed and collected evidence from both the murder scene and the burial site.[98]  She took

casts of tire impressions left at the murder scene and at the burial site, which were a general

---

him to sit next to his friends, at which time I shot him [i]n the head, and I also shot him
some more.  Joel and my brother continued asking me why I had killed the guys, that all
they wanted was to beat them up.  I told Joel and my brother that the guys I had shot
shouldn't [have] messed with my mother.  In Spanish I said, "Pues que no chingen con
mi jefa," meaning that the guys shouldn't [have] fucked with my mother.  I told them to
remove the clothes from all three dead guys.  Joel and Jose Luis removed the clothes
from the bodies.  As I tried to get the nude bodies towards the rear inside compart[ment]
of my Blazer, Joel, Roberto, and Jose Luis would not help be[c]ause they wanted to
leave.  I gues[s] they somehow decided to help me load the bodies.  The three then
helped me load the dead guys I had killed, into the back of my truck.  I put their clothes
on top of the bodies.  I then drove to my house and got one shovel.  Roberto got mad and
left my house.  Joel, Jose Luis and myself then drove the bodies to a desert area west of
Flagger Rd. where I dug a hole approximately five feet deep.  Jose Luis dr[agged] them
close to where I was digging their grave.  When I completed the grave, I dumped them
one at a time on top of eachother.  I covered the hole back up after the three were in the
grave.  Joel got some brush weed and dusted the ground covering our tracks.  We then
got into my Blazer and went to my mom's house.  We all went our separate ways
afterwards.  I had already burnt the three dead guy's clothes.  I had also already hidden
the gun inside the chicken coop where I store dog food and chicken feed.  I had done
these things when I went to get a shovel.  I also thre[w] the rest of the spent rounds I
picked up and threw somewhere in the desert.  On the night after the killings I told my
two brothers and Joel, that they better not mention anything to anyone or else they'll be
sorry.  Since the killings I have felt very remorseful and regret what I have done.  I just
went out of control over my mother's broken windows and her just getting scared.
That's the reason I'm telling the truth now.  I have been shown two pictures and a Texas
Driver's License of three male individuals by Detective Daniel Diaz and asked if I
recognize any of the three.  The three male individuals are the three I killed Saturday,
November 23, 1996.  I also drew a small map of our location during the incident.

RR at Vol. 34 of 35, State's Exhibit 3 (November 25, 1996 Statement of Ignacio Gomez), pp. 1-2; *see
also* RR at Vol. 27 of 35, testimony of Det. Onesimo L. Esparza, pp. 284-6, 290-1, 293-5; *see also* RR at
Vol. 34 of 35, State's Exhibit 4 (signed consent to search truck); State's Exhibit 5 (signed consent to
search house).

[97]*See* RR at Vol. 28 of 35, testimony of Det. Onesimo L. Esparza, pp. 40-7.

[98]*See* RR at Vol. 28 of 35, testimony of Shelley Bennet, pp. 95-123.

match to the tires on Gomez' impounded truck.[99]  She also collected evidence from Gomez'

truck, including blood stained carpet samples, other blood samples, and vacuum samples.[100]  A

human hair in one of the vacuum samples exhibited microscopic characteristics similar to known

pubic hairs taken from Michael Meredith's body.[101]  Bennet also found a rag in the truck.[102]  At

the murder scene, Bennet collected one spent bullet, a bullet fragment and three unspent bullets

from the murder scene.[103]  The spent bullet and one of the unspent bullets were a different brand

than the other two unspent bullets and appeared somewhat older than the other bullets.[104]  The

other bullets and bullet fragment were all .38 caliber rounds.[105]

Patricia Moran, another crime scene technician for the El Paso County Sheriff's Office,

photographed and collected a loaded .357 Ruger pistol from inside a tin trash can that was sitting

next to a 55-gallon drum on Gomez' property.[106]  She photographed burned debris in and around

the drum and collected several items of clothing from inside Gomez' home.[107]  She also collected

the bullets that were taken from the victims' bodies during their autopsies.[108]

---

[99]See id., pp.101, 107-9, 112-3, 145-6, 148.

[100]See id., pp. 150-1, 153-60, 161, 164-5.

[101]See id., pp. 241-2.

[102]See id., p. 166.

[103]See id., pp. 140-5.

[104]See id., pp. 171-3.

[105]See id., p. 176.

[106]See RR at Vol. 28 of 35, testimony of Patricia Moran, pp. 189-90.

[107]See id., pp. 188, 199-201.

[108]See id., pp. 202-6.

Ronald Richardson, a firearms examiner, testified that the .357 Ruger found on Gomez' property could chamber and fire .38 caliber ammunition.[109] He further testified that both the spent bullet and the bullet fragment found at the murder scene were fired from that weapon.[110] He similarly concluded that two of the three bullets recovered from Matthew Meredith's body and the bullet recovered from Toby Hathaway's body were fired from the Ruger found on Gomez' property.[111] He was unable to reach a conclusion regarding the bullet recovered from Michael Meredith's body because it was a lead bullet and more easily deformed.[112]

The victims were positively identified as Matthew Meredith, Michael Meredith, and Toby Hathaway.[113] The medical examiner testified that all three teenagers died from gunshot wounds and that their bodies had been dragged after death occurred.[114]

The State presented evidence at the punishment phase that Gomez' reputation for being a peaceful and law-abiding citizen was poor, and that "if you weren't family, you didn't mean anything to him."[115] Mark Gene Depler, a former El Paso County Sheriff's Office employee,

---

[109]See RR at Vol. 28 of 35, testimony of Ronald Richardson, pp. 218-9.

[110]See id., pp. 223-5.

[111]See id., pp. 225-6.

[112]See id., p. 226.

[113]See RR at 29 of 35, testimony of Juan Contin, M.D., Chief Medical Examiner for El Paso County, Texas, pp. 3, 8, 20.

[114]See id., pp. 3-46. Toby Hathaway had been shot four times, once each in the head, back, chest, right thigh, and left wrist and hand. See id., pp. 4-19. Michael Meredith had been shot once in the head. See id., pp. 20-22. Matthew Meredith had been shot six times, sustaining a close-range gunshot wound to his forehead, a second gunshot wound through his right cheekbone, a third gunshot wound to the back of his neck, a fourth gunshot wound to his chest, a fifth gunshot wound to his upper abdomen, and a sixth gunshot wound to his left hand. See id., pp. 29-37.

[115]See RR at Vol. 31 of 35, testimony of Francisco Silva, Sr., p. 48; testimony of Mark Gene Depler, pp. 51-2.

testified that on January 31, 1989, he had responded to a suspicious vehicle call involving Gomez and his brothers, who had been cruising the neighborhood.[116]  During that call, Gomez resisted arrest for public intoxication, and force was required to subdue him.[117]  The State also introduced evidence that Gomez had three prior convictions for driving while intoxicated and one for possession of a controlled substance.[118]

Lazaro Alvarez, a former El Paso police officer, testified that on July 20, 1987, he made a traffic stop because Gomez was impeding traffic with his truck.[119]  Alvarez ultimately arrested Gomez during that encounter for unlawfully carrying a weapon after discovering that Gomez had hidden a .25 caliber Titan automatic handgun in the crease of the truck's seat.[120]

The State also elicited testimony from Uvaldo Hurtado[121] that, on or about August 11, 1987, while Hurtado was sitting on a bicycle and talking to Gomez' then-girlfriend, Gomez tried to run him over with his truck.[122]  Lastly, the victims' family members testified about the effects

---

[116]*See* RR at Vol. 31 of 35, testimony of Mark Gene Depler, pp. 53.

[117]*See id.*, p. 52.

[118]*See* RR at Vol. 35 of 35, State's Exhibits 232-36.

[119]*See* RR at Vol. 31 of 35, testimony of Lazaro Alvarez, pp. 56-7.

[120]*See id.*, pp. 62-4.

[121]At the time of Gomez' trial, Hurtado was serving a sentence in Amarillo, Texas for aggravated robbery.  *See* RR at Vol. 31 of 35, testimony of Uvaldo Hurtado, p. 70.

[122]*See id.*, pp. 73-5, 82-5.  Hurtado acknowledged on cross-examination that he had been charged with attempted murder for knifing Gomez' brother Jose Luis, but stated that the charge had been dismissed because he had been defending himself against an attack by Jose Luis and Gomez' other brothers. *See id.*, pp. 87, 90-3.  Defense counsel objected to this testimony and requested a limiting instruction because Gomez had not been present during the incident. *See id.*, p. 96.  The trial court granted the request, twice instructing the jury to not consider the actions of Gomez' brothers while deliberating on Gomez' punishment. *See id.*, p. 98.  During Gomez' punishment case-in-chief, Juan Gomez testified that neither he nor Gomez were present when Hurtado knifed their brother Jose Luis. *See* RR at Vol. 32 of 35, testimony of Juan Gomez, pp. 78-9.

of the murders on them.[123]

In mitigation, the defense presented testimony by Gomez' brother-in-law, Paul Alvarez, that Gomez was truthful, kind, helpful, a good father, a hard worker, good to his family, and never angry towards anyone.[124] On cross-examination, Alvarez conceded that he never associated with Gomez outside the family.[125]

Javier Torres testified that he became acquainted with Gomez when some local families wanted to build a church and needed a carpenter.[126] Gomez also helped Torres build his store. Torres stated that Gomez was a serious, responsible person, a hard worker, a good carpenter, and that he had never heard anything bad about him in the community.[127] On cross-examination, Torres stated that he was aware of Gomez' past problems with alcohol abuse and that Gomez had been arrested once.[128] He did not know, however, that Gomez used narcotics, had a felony DWI conviction, had been arrested for carrying a concealed weapon, or that he had tried to kill Uvaldo Hurtado in 1987.[129] He stated that if he had known these things and that Gomez was capable of the kind of aggression involved in the murders, he would not have let Gomez into his home.[130]

---

[123]*See* RR at Vol. 31 of 35, testimony of Mary Meredith, pp. 102-9; testimony of Eva Hathaway, pp. 110-4; testimony of Jonathan Hathaway (Toby Hathaway's younger brother), pp. 115-7.

[124]*See* RR at Vol. 32 of 35, testimony of Paul Alvarez, pp. 3-5.

[125]*See id.*, pp. 5-6.

[126]*See* RR at Vol. 32 of 35, testimony of Javier Torres, pp. 9-11.

[127]*See id.*, p. 12.

[128]*See id.*, p. 17.

[129]*See id.*, pp. 18-20.

[130]*See id.*, p. 20.

Jorge Soria, a Catholic priest, testified that he had worked with Gomez on the church construction project.[131]  He stated that Gomez got along well with other people working on the project and that some of the teenagers involved considered him a carpentry teacher.[132]  Father Soria testified that Gomez had a "better than good" character reputation in the community and that it surprised him to hear of Gomez' various run-ins with the law, including his involvement in the instant offense.[133]

Noelia Diaz, a neighbor, testified that Gomez had a reputation for being hardworking and responsible.[134]  She also admitted that she did not know what Gomez did at night, and stated that, even after learning that Gomez had tried to kill Hurtado and being read a newspaper account of Gomez' confession detailing how and why he had murdered the three teenagers, that she considered him a peaceful person.[135]

Luis Maria Duarte testified that she came to know Gomez when he was working on the church construction project and that he had a reputation in the community for being very responsible, honorable, cheerful, and a good person.[136]  She was non-responsive on cross-examination.[137] Only after being admonished by the trial judge did she reluctantly admit that she had not known that Gomez had been arrested for unlawfully carrying a weapon, nor that he had

---

[131]*See* RR at Vol 32 of 35, testimony of Jorge Soria, p. 27.

[132]*See id.*, pp. 28-9.

[133]*See id.*, pp. 30, 36.

[134]*See* RR at Vol. 32 of 35, testimony of Noelia Diaz, p. 40.

[135]*See id.*, pp. 41-3.

[136]*See* RR at Vol. 32 of 35, testimony of Luis Maria Duarte, p. 47.

[137]*See id.*, pp. 47-8, 54-5, 56-8.

tried to killed Hurtado (although she might have heard a rumor) or that he had multiple arrests for DWI.[138]

Raymundo Frarie-Avalos, another neighbor, testified that a friend had recommended Gomez to do some work on his house, that he admired and respected Gomez because he worked two jobs, and that Gomez was always very responsible towards his family.[139]  On cross-examination, however, he stated that he did not know that Gomez had been arrested and sent to jail three times for DWI and agreed with the prosecutor that repeated arrests for DWI did not benefit Gomez' family and were not completely consistent with a man who was really worried about his family.[140]  He also stated that he did not know about Gomez' weapons-possession arrest or that he had tried to kill Hurtado.[141]  He ultimately refused to admit that he might not know Gomez as well as he thought he did, or to change his opinion about Gomez, stating that he could not believe that all the things the prosecutor was saying were true.[142]

A former neighbor, Victor Hugo Diaz, testified that Gomez taught him about carpentry while they were building the Catholic church, that Gomez had a reputation as a responsible person with a good heart, and that he was a very good father and loving husband.[143]  On cross-examination, he agreed with the prosecutor that breaking the law multiple times would be the

---

[138]See id., pp. 47-8, 54-5, 56-8.

[139]See RR at Vol. 32 of 35, testimony of Raymundo Frarie-Avalos, pp. 61-3.

[140]See id., pp. 65-7.

[141]See id., p. 65.

[142]See id., p. 66.

[143]See RR at Vol. 32 of 35, testimony of Victor Hugo Diaz, pp. 72-3.

actions of an irresponsible person.[144]  He also stated that he did not know about Gomez' DWI convictions, that he resisted arrest, or that he had tried to kill Hurtado.[145]

Lorena Favela-Gomez, Gomez' wife, testified that he had been a very good husband and father, provided well for his family, and was a good, helpful, kind man.[146]  She stated that he took care of the car, the house, the yard, the garden, and their dogs, as well as taking their children to school in the morning.[147]  He also distributed pay for construction work equally among workers on the job.[148]  When asked about his drinking, she stated that alcoholism was a disease which Gomez had overcome and that he had been sober for the past five years.[149]

In urging the jury to return a verdict of death, the prosecution emphasized two points. First, it argued that the heinousness of the offense – three brutal killings over nothing more than two broken windows –  by itself warranted a death sentence.[150]  It then attempted to cast the evidence Gomez had offered in mitigation in a different light.  On one hand, the prosecution questioned the value of the testimony in Gomez' favor, given the witnesses' uniform lack of knowledge about Gomez's past.[151]  On the other hand, even taking the witnesses' testimony at face value, it argued that whatever mitigating value the jury might find in it was completely

---

[144]*See id.* at 73-4.

[145]*See id.*, p. 74.

[146]*See* RR at Vol. 32 of 35, testimony of Lorena Favela-Gomez, pp. 83-7.

[147]*See id.*, pp. 84-5.

[148]*See id.*, p. 87.

[149]*See id.*, p. 86.

[150]*See* RR at Vol. 32 of 35, Closing Statement by the State (Joe Rosales, Esq.), pp. 104-5.

[151]*See id.*, p. 106.

offset by that same testimony's implications regarding Gomez' future dangerousness: ". . . [H]e's

not like everybody else.  He's different. . . . Not only is he not like you, but he is perhaps one of

the more dangerous, if not most dangerous people that there are, because you can't tell what he

is."[152] In its rebuttal closing statement, the prosecution reemphasized this point:

> You know from the act he committed that he has no control over himself.  You
> know that this killing was as senseless as any killing that you have probably ever
> heard about in your life.  That it lacked any motive that has even any ring of
> sensibility.  And you know that his behavior is absolutely, totally and completely
> unpredictable.[153]

The defense emphasized the testimony offered in mitigation, tried to discount the State's

evidence, and attempted to answer the State's future dangerousness argument by suggesting that

Gomez would spend his days in relative isolation if allowed to live.[154]  Defense counsel asked the

jury to rise above its instinct for vengeance by sparing his client's life.[155]

### B.  Procedural History

Gomez was convicted of capital murder in June 1998 for the deaths of Michael Meredith,

Matthew Meredith, and Toby Hathaway and sentenced to death in the 384th Judicial District

Court of El Paso County, Texas.[156]  His capital murder conviction was automatically appealed to

the Texas Court of Criminal Appeals ("Court of Criminal Appeals"), which affirmed his

---

[152]*Id.*, pp. 105, 107.

[153]RR at Vol. 32 of 35, Sur-Closing Statement by the State (Rick Locke, Esq.), p. 139.

[154]*See* RR at Vol. 32 of 35, Closing Statement by the Defendant (Maximino Muñoz, Esq.), p.124.
The State foreclosed this line of argument when it successfully objected that defense counsel was
attempting to introduce facts outside the record.  *See* RR at Vol. 32 of 35, pp. 124-5.

[155]*See* RR at Vol. 32 of 35, Closing Statement of the Defendant (Jaime Gandara, Esq.), 136-7.

[156]*The State of Texas v. Ignacio Gomez*, No. 960D10271 (384th Dist. Ct., El Paso County, Tex.
June 11, 1998 (guilt); June 16, 1998 (death sentence)).

conviction and sentence in an unpublished opinion issued September 20, 2000.[157]  Gomez did not

file a petition for a writ of certiorari, but did file a state application for writ of habeas corpus on

August 23, 2000.  The trial court filed its findings of fact and conclusions of law on March 22,

2002.[158]  The Court of Criminal Appeals adopted these findings of fact and conclusions of law

and denied Gomez' petition in an unpublished opinion issued June 5, 2002.[159]

Gomez filed his instant federal petition for habeas corpus relief on May 30, 2003.

Therein, he asserts eight grounds for relief.  Specifically, he argues that:  (1) his Sixth

Amendment right to an impartial jury and his Fourteenth Amendment right to due process were

violated when qualified venire members were excluded from jury service because they opposed

or had conscientious objections to the death penalty (Claim One); (2) his Sixth Amendment right

to effective assistance of counsel was violated at the guilt-innocence stage of the trial because

defense counsel failed to prevent the exclusion for cause of venire members who opposed or had

conscientious objections to the death penalty (Claim Two); (3) his execution would violate the

Eighth Amendment, because he is presently incompetent to have his sentence carried out (Claim

Three); (4) his Sixth Amendment right to effective assistance of counsel was violated at the

punishment phase because trial counsel did not present readily available mitigation evidence

(Claim Four); (5) the trial court violated the Compulsory Process Clause of the Sixth

Amendment, the Eighth Amendment, and the Fourteenth Amendment when it refused to inform

the jury that Gomez would be required to serve a minimum of 40 years in prison before

---

[157]See Ignacio Gomez v. State, No. 73,199 (Tex. Crim. App. Sept. 20, 2000).

[158]The Honorable Sam Callan presided over voir dire.  See RR at Vols. 24-26 of 35.  The Honorable Patrick Garcia presided over the remainder of Gomez' trial and the state habeas corpus proceedings.  See RR at Vols. 27-35 of 35.

[159]See Ex parte Gomez, No. 52,166-01 (Tex. Crim. App. June 5, 2002).

becoming eligible for parole (Claims Five, Six, and Seven); (6) his conviction and sentence offend the Supremacy Clause because they are based partly on a confession and consent to search property obtained by law enforcement officers in a manner that violated Gomez' rights under the Vienna Convention on Consular Relations ("the Vienna Convention") (Claim Eight).  The Court notes that, although it is not listed in his "Grounds for Relief" (the initial summary of his claims), Gomez lists an Equal Protection Clause claim on page 54 of his Petition.  The Court will refer to this additional ground for relief as Gomez' ninth claim and address it in the portion of this Opinion discussing the exhaustion requirement.

## II.    EXHAUSTION OF CLAIMS

In his first claim, Gomez argues that the following members of the venire panel were excluded in violation of the Sixth and Fourteenth Amendments: Susana Campos, Joan Carson, Maria Garcia, Luis F. Jaramillo, and Miguel P. Martinez.[160]  Respondent contends that this Court may not review the Sixth Amendment aspect of Gomez' claim regarding Carson, Garcia, Jaramillo, and Martinez because he failed to raise it as to these jurors in his direct appeal or his state writ application.[161]  Because Gomez failed to exhaust the Sixth Amendment aspect of his claim as to these jurors in state court, and such claim would now be dismissed as an abuse of writ if he presented it in state court, Respondent argues that this claim is procedurally barred from federal review.[162]

Moreover, argues Respondent, although Gomez did raise the due process aspect of his claim regarding these jurors in his state writ application, he could have but did not raise it first in

---

[160]See Pet'r Br., pp. 16-37.

[161]See Resp't Ans., p. 26.

[162]See Resp't Ans., p. 26.

his direct appeal.[163]  Therefore, argues Respondent, the state habeas court correctly determined

that Gomez' due process claim regarding Carson, Garcia, Jaramillo, and Martinez was

procedurally barred under state law.[164]  Respondent further asserts that the state habeas court's

rejection of Gomez' due process claims as to these jurors thus constitutes an adequate and

independent state law grounds for dismissal which precludes federal habeas corpus review.[165]

     In his second claim, Gomez argues that trial counsel was ineffective for failing to prevent

the exclusion for cause of Campos, Carson, Garcia, Jaramillo, and Martinez.[166]  Respondent

contends that this Court may not review this claim as to Campos.[167]  Although Gomez claimed

in his state habeas writ application that counsel was ineffective for failing to prevent the

exclusion of Carson, Garcia, Jaramillo, and Martinez for cause, Respondent contends that he did

not therein allege that counsel was ineffective for failing to prevent the exclusion of Campos for

cause.[168]

     In his eighth claim of error, Gomez argues that his conviction and sentence offend the

Supremacy Clause because they are based partly on a confession and consent to search property

obtained by law enforcement officers in a manner that violated Gomez' rights under the Vienna

Convention.[169]  Respondent contends that Gomez inadequately briefed this argument on direct

---

[163]*See* Resp't Ans., p. 26.

[164]*See* Resp't Ans., pp. 26-7.

[165]*See* Resp't Ans., p. 27.

[166]*See* Pet'r Br., p. 37-42.

[167]*See* Resp't Ans., p. 36.

[168]*See* Resp't Ans., p. 36.

[169]*See* Pet'r. Br., pp. 83-97.

appeal, failing to apprise the state court of the same legal theory upon which he now bases his assertion.[170]  According to Respondent, Gomez has thus failed to fairly present his claim to the state court, rendering his instant claim unexhausted.[171]

In his ninth claim of error, Gomez contends that the trial court violated the Equal Protection Clause when it refused to inform the jury that Gomez would be required to serve a minimum of 40 years in prison before becoming eligible for parole, because similarly situated capital murder defendants have received the benefit of such instruction, with the approval of the Texas Court of Criminal Appeals.[172]  Respondent argues that the state habeas court found that Gomez could have but failed to raise this claim in his direct appeal and thus, that the claim was not cognizable in state habeas proceedings.[173]  Therefore, argues Respondent, an independent and adequate state law ground for dismissal precludes federal habeas corpus relief on Gomez' Equal Protection claim.[174]

   A. Legal Standard – Exhaustion of Claims under 28 U.S.C. § 2254

Under 28 U.S.C. § 2254(b)(1)(A), a court shall *not* grant habeas relief unless "the

---

[170]*See* Resp't Ans., pp. 69-70.

[171]*See* Resp't Ans., pp. 70-1.

[172]*See* Pet Br., p. 54.

[173]*See* Resp't Ans., p. 53.  The state habeas court alternatively rejected Gomez' Equal Protection claim on the merits, concluding that he had failed to plead any facts showing that the trial court's refusal to submit his requested parole instruction violated his right to equal protection. The state habeas court's invocation of a procedural bar as an alternative basis to deny relief does not deprive the state of the benefit of AEDPA's deferential standard.  *See Busby v. Dretke*, 359 F.3d 708, 721 n.14.  Because it is clear from the state court record that it rejected the substance of Gomez' claim, that rejection is therefore an adjudication on the merits within the meaning of 28 U.S.C. § 2254(d).  *See id.*

[174]*See* Resp't Ans., p. 53.

applicant has exhausted the remedies available in the courts of the State."[175]

> The requirements of the exhaustion concept are simple:  An applicant must fairly apprise the highest court of his state of the federal rights which were allegedly violated.  Further, the applicant must present his claims in a procedurally correct manner.  If, for whatever reason, an applicant bypasses the appellate processes of his state - whether through procedural default or otherwise - he will *not* be deemed to have met the exhaustion requirement absent a showing of one of two particulars.  He must either demonstrate cause and prejudice *or* show that the failure to consider his claims will result in a fundamental miscarriage of justice.[176]

Gomez, therefore, has satisfied the exhaustion requirement if he "fairly present[ed]" his issues to Texas courts.[177]

To determine whether a claim has been fairly presented to state courts, the Supreme Court has provided the following guidance:

> [F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief. . . .We have also indicated that it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.[178]

"It is not enough that all the facts necessary to support the federal claim were before the state

---

[175]*Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001), *cert. denied*, 534 U.S. 945, 122 S. Ct. 329, 151 L. Ed. 2d 243 (2001); *accord Baldwin v. Reese*, ___ U.S. ___, ___, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64, 69 (2004).

[176]*Beazley*, 242 F.3d at 263 (quoting *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993)).

[177]*See Picard v. Connor*, 404 U.S. 270, 275-6, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438, 443-4 (1971) (state courts must have an opportunity to hear and dispose of the same claim that the petitioner urges upon federal courts); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (petitioner must have fairly presented the substance of his claim to the state courts); *Wilson v. Foti*, 832 F.2d 891, 893-4 (5th Cir. 1987) (to have exhausted his state-court remedies, petitioner must have appealed his claims through to state's highest court); *Richardson v. Procunier*, 762 F.2d 429, 431-2 (5th Cir. 1985) (the exhaustion doctrine requires that the Texas Court of Criminal Appeals be given an opportunity to review and rule upon a petitioner's claim before he resorts to the federal courts).

[178]*Gray v. Netherland*, 518 U.S. 152, 162-3, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457, 470 (1996) (citing *Picard v. Connor*, 404 U.S. at 271, 92 S. Ct. at 512, 30 L. Ed. at 443-4, and *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3, 7 (1982)).

courts or that a somewhat similar state-law claim was made."[179] "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."[180] Thus, Gomez will have failed to exhaust his claims if he presents new legal theories or factual claims in his federal habeas petition which he failed to present in his state court appeal.[181]

Because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it is satisfied "if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law."[182] However, the procedural bar that gives rise to exhaustion provides an independent and adequate state law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.[183] "The existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural

---

[179]*Wilder*, 274 F.3d at 259-60 (citing *Anderson v. Harless*, 459 U.S. at 6, 103 S. Ct. at 277, 74 L. Ed. at 7).

[180]*Baldwin v. Reese*, ___ U.S. at ___, 124 S. Ct. at 1351, 158 L. Ed. at 71.

[181]*See Anderson v. Harless*, 459 U.S. at 6-7, 103 S. Ct. at 277, 74 L. Ed. 2d at 7; *see also Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983).

[182]*Gray v. Netherland*, 518 U.S. 152, 161-2, 116 S. Ct. 2074, 2080, 135 L. Ed. 2d 457, 470 (1996) (citing *Castille v. Peoples*, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060, 103 L. Ed. 2d 380, 386 (1989), and *Engle* v. *Isaac*, 456 U.S. 107, 125 n.28, 102 S. Ct. 1558, 1570, 71 L. Ed. 2d 783, 798 (1982)).

[183]*See Gray*, 518 U.S. at 162, 116 S. Ct. at 2080, 135 L. Ed. at 470; *Teague* v. *Lane*, 489 U.S. 288, 298, 109 S. Ct. 1060, 1068, 103 L. Ed. 2d 334, 347 (1989); *Engle v. Isaac*, 456 U.S. at 129, 102 S. Ct. at 1572-73, 71 L. Ed. 2d at 801; *Wainwright* v. *Sykes*, 433 U.S. 72, 90-1, 97 S. Ct. 2497, 2508, 53 L. Ed. 2d 594, 610 (1977).

rule."[184]   "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel."[185]

With the foregoing principles in mind, the Court will consider whether Gomez has exhausted his claims, and if not, whether he has adequately shown cause and prejudice for his default.

### B. Discussion

1. *Claim One: Qualified venire members were excluded from jury service because they opposed or had conscientious objections to the death penalty.*

Gomez has not responded to Respondent's argument that his instant claim is procedurally barred from federal habeas review because it was dismissed on an independent and adequate state law ground (*i.e.*, because he failed to raise this claim as to Carson, Garcia, Jaramillo, and Martinez in his direct appeal).   This Court's independent review of the record persuades it that Respondent is correct.  The state habeas court did indeed determine that Gomez had procedurally defaulted his due process and impartial jury claims as to these four members of the venire panel.[186]  The state habeas court's ground for dismissal thus constitutes an independent and adequate state law basis for dismissal that now precludes federal review.[187]  Because Gomez has not shown, or even attempted to show, cause and prejudice for the default, the Court concludes

---

[184]*Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397, 409 (1986).

[185]*McCleskey v. Zant*, 499 U.S. 467, 493-4, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517, 544 (1991) (internal quotation marks and citation omitted).

[186]*See Ex parte Gomez*, Findings of Fact & Concl. of Law, p. 16 ¶ 1.

[187]*See Gray v. Netherland*, 518 U.S. 152, 162, 116 S. Ct. 2074, 2080, 135 L. Ed. 2d 457, 470 (1996).

that Gomez is entitled to review of his first claim only as to prospective juror Susana Campos.

2.  *Claim Two:  Trial counsel was ineffective for failing to prevent the exclusion for cause of qualified venire members.*

Gomez has similarly not responded to Respondent's argument that he failed to exhaust his second claim as to Susana Campos.  This Court has reviewed the record and concludes that Gomez did not raise his ineffective assistance claim regarding Campos before his instant federal habeas corpus petition.  Because Gomez has not shown or attempted to show cause and prejudice for his procedural default, the Court concludes that he is entitled to federal habeas corpus review of his second claim only as to Carson, Garcia, Jaramillo, and Martinez.[188]

3.  *Claim Eight: Gomez' conviction and sentence offend the Supremacy Clause because they are based partly on a confession and consent to search property obtained by law enforcement officers in a manner that violated Gomez' rights under the Vienna Convention on Consular Relations.*

Gomez argues that he fairly presented and thus exhausted his Supremacy Clause claim by raising it in his direct appeal.[189]  Therein, he contends, he argued that the State's failure to comply with the terms of the Vienna Convention violated both Texas law and the Supremacy Clause of the United States Constitution.[190]  He states that the Texas Court of Criminal Appeals addressed only his state law argument, without separately considering his federal constitutional claim, and in fact, mischaracterized all of his Vienna Convention claims as Article 38.23 complaints.[191]

---

[188]*See Gray*, 518 U.S. at 162, 116 S. Ct. at 2080, 135 L. Ed. 2d at 470.

[189]*See* Pet'r. Br., pp.  84-5.

[190]*See* Pet'r. Br., p. 84.

[191]*See* Pet'r. Br., p. 85.

Respondent counters that, although Gomez placed all of the facts necessary to his Supremacy Clause claim before the state court[192] and argued a similar state law claim, he mentioned the Supremacy Clause only in passing.[193]  According to Respondent, Gomez' entire Supremacy clause argument consisted of the following passage:

E.  CLAIM IMPLICATES THE CONSTITUTION

The State of Texas' failure to adhere to, and the trial court's failure to uphold a United States treaty violates Art. VI, cl. 2 (the Supremacy Clause) of the United States Constitution.  *Arteaga* [*v. Texas Department of Protective and Regulatory Services,*] 924 S.W.2d [756,] 761 [(Tex. App. – Austin 1996, writ denied) (citing U.S. Const. Art. VI, cl. 2)].[194]

Respondent argues that *Arteaga* merely states that Texas must adhere to United States treaties as the supreme law of the land.[195]  It does not, according to Respondent, address what rights or remedies are available to criminal defendants who are not advised of their rights under the Vienna Convention because it is a child custody case, rather than a criminal case, and in any event, the treaty's notice requirements had been satisfied in that matter.[196]

This Court has examined the record and concludes that it supports Respondent's contentions.  In his summary of claims at the beginning of his direct appeal brief, Gomez set

---

[192]Gomez alleged that he was a Mexican citizen, that he was in custody when his confession and consent to search were obtained, and that he was not informed of his rights under the Vienna Convention.

[193]*See* Resp't Ans., pp. 69-70.  Gomez argued that the trial court's denial of his motion to suppress the confession and evidence violated Texas Code of Criminal Procedure Article 38.23(a) because law enforcement officials failed to administer warnings required by the Vienna Convention.  *See See id.*, p. 70 n.18.  The state court rejected this claim, concluding that Article 38.23 does not apply to treaties. *See Ignacio Gomez v. Texas*, No. 73,199, slip op. at 2-3 (Tex. Crim. App. Sept. 20, 2000).

[194]Resp't Ans., p. 70.

[195]*See id.*

[196]*See id.*

forth his Supremacy Clause claim as Claim Two.[197]  Within his brief, his argument on this point

consisted solely of the passage to which Respondent has drawn the Court's attention: "The State

of Texas' failure to adhere to, and the trial court's failure to uphold a United States treaty violates

Art. VI, cl. 2 (the Supremacy Clause) of the United States Constitution."[198]  Although Gomez

filed a Motion for Rehearing, he sought to re-argue only two entirely unrelated issues.[199]  He

generally re-urged his other claims, including Claim Two, but did not re-argue them.  At no point

did Gomez alert the Court of Criminal Appeals that he believed it had neglected to address his

Supremacy Clause claim.  For these reasons, the Court concludes that Gomez failed to exhaust

his Supremacy Clause claim and is therefore not entitled to federal habeas corpus review.

> **4.    *Claim Nine: The trial court's refusal to instruct the jury regarding
> Gomez' parole eligibility violated the Equal Protection Clause.***

The state habeas court determined that Gomez' Equal Protection claim was procedurally

barred because he could have, but did not, raise it in his direct appeal.[200]  After examining the

record, the Court finds that it supports the state habeas court's determination.  Accordingly, it

concludes that Respondent is correct in his assertion that the state habeas court's rejection of

Gomez' Equal Protection claim on procedural grounds constitutes an adequate and independent

---

[197]*See Ignacio Gomez v. Texas*, No. 73,199 (Tex. Crim. App. Sept. 20, 2000), Appellant's Brief, p. 5.

[198]*See id.*, p. 13.

[199]*See id.*, Appellant's First Amended Motion for Rehearing, p. 5.  Gomez sought to re-argue only the following points: (1) "[The Court of Criminal Appeals] fails to analyze those authorities dealing directly with questions about the age of victim with regard to punishment considerations"; and (2) "Venirewoman Campos unequivocally stated that she did not have a preconceived answer to the special issues, could set aside her beliefs and fairly and impartially answer the special issue on punishment." *See id*.

[200]*See Ex parte Gomez*, Findings of Fact & Concl. of Law at 15 ¶¶ 78, 80.

state law ground for dismissal which precludes federal habeas review.[201]

### III.   APPLICABILITY OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

#### A.   The AEDPA Standard of Review

Because Gomez filed his federal habeas corpus action after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), insofar as the state courts adjudicated his claims herein on the merits, the AEDPA governs this Court's review of those claims.[202]

Under the AEDPA standard of review, this Court cannot grant Gomez federal habeas corpus relief in this cause concerning any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state

---

[201]Even if federal review of Gomez' instant claim were not precluded due to the claim's prior dismissal on adequate and independent state law grounds, the Court would nonetheless deny relief, concluding that Gomez abandoned the issue.  The claim does not appear in his Petition at all.  *See* Petition for a Writ of Habeas Corpus, docket entry no. 15, pp. 5-6.  It is also absent from the initial summary of claims (his "Grounds for Relief"), contained in Petitioner's Brief.  In fact, the claim does not appear until page 54 of Petitioner's Brief, at the end of a section re-stating Claims Five, Six, and Seven, and he altogether fails to brief the issue.  *See* Pet'r. Br., p. 54.  Because he fails to develop the argument, the Court concludes that he has waived the issue.  *See Royal v. Tombone*, 141 F.3d 596, 599 n.3 (5th Cir. 1998) (stating that a petitioner waived inadequately briefed issues in his appeal from the denial of his habeas corpus petition); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (stating that a party who inadequately briefs an issue waives the claim).  In an abundance of caution, however, the Court has examined Respondent's contention that Gomez' Equal Protection claim is procedurally barred from federal habeas corpus review.

[202] *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9, 22 (2001).

court proceeding.[203]

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. § 2254(d)(1) have independent meanings.[204]  Under the "contrary to" clause, a federal habeas court may grant relief if:  (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.[205] Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.[206]  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly

---

[203] See Wiggins v. Smith, 539 U.S. 510, *19-20, 123 S. Ct. 2527, 2534, 156 L. Ed. 2d 471 (2003); Price v. Vincent, 538 U.S. 634, 639-9, 123 S. Ct. 1848, 1852-53, 155 L. Ed. 2d 877 (2003); Williams v. Taylor, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000); 28 U.S.C. §2254(d).

[204] See Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002); Penry v. Johnson, 532 U.S. at 792, 121 S. Ct. at 1918; Williams v. Taylor, 529 U.S. at 404-5, 120 S. Ct. at 1519.

[205] See Price v. Vincent, 538 U.S. at 640, 123 S. Ct. at 1853, ("a decision by a state court is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"); Bell v. Cone, 535 U.S. at 694, 122 S. Ct. at 1850; Penry v. Johnson, 532 U.S. at 792, 121 S. Ct. at 1918 ("A state court decision will be 'contrary to' our clearly established precedent if the state court either 'applies a rule that contradicts the governing law set forth in our cases,' or 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"); Williams v. Taylor, 529 U.S. at 404-6, 120 S. Ct. at 1518-9.

[206] See Wiggins v. Smith, 539 U.S. at *19-20, 123 S. Ct. at 2534-5; Woodford v. Visciotti, 537 U.S. 19, 24-5, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002); Bell v. Cone, 535 U.S. at 694, 122 S. Ct. at 1850; Penry v. Johnson, 532 U.S. at 792, 121 S. Ct. at 1918; Williams v. Taylor, 529 U.S. at 407-8, 120 S. Ct. at 1520-1.
  In Williams, the Supreme Court expressly reserved for another day the issue of how federal habeas courts should determine whether a state court erroneously extended a legal principle into a new realm or erroneously refused to extend existing legal principle into a new area.  See Williams v. Taylor, 529 U.S. at 408-9, 120 S. Ct. at 1521.

established federal law was "objectively unreasonable."[207]  The focus of this inquiry is whether the state court's application of clearly established federal law is objectively unreasonable, rather than merely incorrect.[208]

The AEDPA significantly restricts the scope of federal habeas review of state court fact findings, requiring that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous.[209]

With the foregoing principles in mind, this Court turns to the merits of Gomez' remaining claims for federal habeas corpus relief.

---

[207] *See Wiggins v. Smith*, 539 U.S. at *20, 123 S. Ct. at 2535; *Woodford v. Visciotti*, 537 U.S. at 25, 123 S. Ct. at 360; *Penry v. Johnson*, 532 U.S. at 793, 121 S. Ct. at 1918; *Williams v. Taylor*, 529 U.S. at 409-11, 120 S. Ct. at 1520-2.

[208] *See Wiggins v. Smith*, 539 U.S. at *20, 123 S. Ct. at 2535; *Price v. Vincent*, 538 U.S. at 640, 123 S. Ct. at 1853, ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."); *Woodford v. Visciotti*, 537 U.S. at 25, 123 S. Ct. at 360; *Bell v. Cone*, 535 U.S. at 694, 122 S. Ct. at 1850; *Penry v. Johnson*, 532 U.S. at 793, 121 S. Ct. at 1918; *Williams v. Taylor*, 529 U.S. at 410-1, 120 S. Ct. at 1522.

[209]*See Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002), *cert. denied*, 537 U.S. 1054 (2002); *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001), *cert. denied*, 534 U.S. 1001 (2001) ("The presumption is particularly strong when the state habeas court and the trial court are one and the same."); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000), (holding state court fact findings are presumed correct and the petitioner has the burden of rebutting the presumption by clear and convincing evidence); *Hicks v. Johnson*, 186 F.3d 634, 637 (5th Cir. 1999), *cert. denied*, 528 U.S. 1132 (2000), (holding the AEDPA requires federal habeas courts to accept as correct state court factual determinations unless the petitioner rebuts same by clear and convincing evidence); *Morris v. Cain*, 186 F.3d 581, 583 (5th Cir. 1999); *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir. 1998), *cert. denied*, 526 U.S. 1074 (1999); *Jackson v. Johnson*, 150 F.3d 520, 524 (5th Cir. 1998), *cert. denied*, 526 U.S. 1041 (1999); *Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997), *cert. denied*, 525 U.S. 859 (1998), (recognizing that under the AEDPA, state court factual findings "shall be presumed correct unless rebutted by 'clear and convincing evidence'"); *Hernandez v. Johnson*, 108 F.3d 554, 558, 558 n.4 (5th Cir. 1997), *cert. denied*, 522 U.S. 984 (1997), (holding that under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing that the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"); 28 U.S.C. § 2254(e)(1).

## IV.   THE MERITS OF GOMEZ' REMAINING CLAIMS

### A.   *Claim One: An otherwise qualified venire member, Susana Campos, was unconstitutionally excluded from jury service because she opposed or had conscientious objections to the death penalty.*

Gomez argues that prospective jurors in Texas capital murder trials may not be excluded for cause, as was Campos, merely because they categorically favor or oppose capital punishment, because their ability to truthfully answer the statutory punishment questions according to the evidence is not necessarily diminished by their general views about the propriety of the death penalty.[210]  Because Campos never stated that her opposition to capital punishment would lead her to give deliberately false answers, or to withhold honest answers, to Texas' "special questions" in order to prevent the imposition of the death penalty, Gomez contends that the trial court erred when it granted the State's challenge for cause.[211]

### 1. Legal Standard

The Supreme Court held in *Witherspoon v. Illinois* that a death sentence cannot be carried out if the jury that recommended that sentence were chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.[212]  The Court emphasized, however, that its holding had

---

[210]*See* Pet'r. Br., pp. 29-30.

[211]*See* Pet'r. Br., pp. 32-3.

[212]*See Witherspoon v. Illinois*, 391 U.S. 510, 521-2, 88 S. Ct. 1770, 1776-7, 20 L. Ed. 2nd 776, 784-5 (1968) (a state may not entrust the determination of whether an individual should live or die to a tribunal organized to return a verdict of death; accordingly, a death sentence cannot be carried out if the jury that recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction).

no bearing

> upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.[213]

The Supreme Court's holding in *Wainwright v. Witt*[214] provides the most recent guidance regarding when a prospective juror may be excluded for cause in a capital case:

> The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. We note that . . . this standard . . . does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen cannot simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.[215]

---

[213] *Witherspoon*, 391 U.S. at 522, n.21, 88 S.Ct. at 1777 n. 21; *see also Adams v. Texas*, 448 U.S. 38, 47-8, 100 S.Ct. 2521, 2528, 65 L. Ed. 2d 581, 591 (1980) (clarifying that the *Witherspoon* doctrine operates as a limitation on the State's power to exclude prospective jurors in a capital case; if prospective jurors are barred from jury service due to their views on capital punishment, on any broader basis than than inability to follow the law or abide by their oaths, the death sentence cannot be carried out).

[214] 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

[215] *Wainwright*, 469 U.S. at 424, 105 S. Ct. at 852-3; *see Mcfadden v. Johnson*, 166 F.3d 757, 758 (5th Cir. 1999).

With the preceding principles in mind, the Court now turns to the merits of Gomez' argument that prospective juror Susana Campos was unconstitutionally excluded for cause from jury service.

### 2. Discussion

The venire members were given a questionnaire to complete. One section instructed the potential juror to check one of five statements that best summarized his or her general views about capital punishment.[216] Campos checked the statement indicating that she was "neither generally opposed to no[r] generally in favor of capital punishment."[217] The juror was then presented with 17 statements expressing different attitudes about the death penalty and instructed to check "Agree" or "Disagree" for each statement.[218]

Campos agreed with the following statements: (1) "Capital punishment has never been effective in preventing crime" (Statement Five); (2) "I do not believe in capital punishment under any circumstances" (Statement Eight); (3) "Capital punishment is not necessary in modern civilization" (Statement Nine); (4) "Life imprisonment is more effective than capital punishment" (Statement Ten); (5) "Execution of criminals is a disgrace to civilized society" (Statement Eleven); (6) "I do not believe in capital punishment, but I do not believe it should be abolished" (Statement Thirteen); (7) "The State cannot teach the sacredness of human life by

---

[216]See Appendix, Tab 4 (Juror questionnaire of Susana Campos), p.15. The choices were, in order: (1) "I am opposed to capital punishment under any circumstances"; (2) "I am opposed to capital punishment except in a few cases where it may be appropriate"; (3) "I am neither generally opposed to no[r] generally in favor of capital punishment"; (4) "I am in favor of capital punishment except in a few cases where it may not be appropriate"; and (5) "I am strongly in favor of capital punishment as an appropriate penalty." Id.

[217]See id., p. 15.

[218]See id., pp. 16-7.

destroying it" (Statement Fifteen); and "Capital punishment is justified only for premeditated murder (Statement Sixteen).[219]

Campos disagreed with these statements: (1) "I think capital punishment is necessary but I wish it were not" (Statement One); (2) "Any person, man or woman, young or old, who commits capital murder should pay with his own life" (Statement Two); (3) "Capital murder punishment is wrong, but it is necessary in our imperfect civilization" (Statement Three); (4) "Every criminal should be executed" (Statement Four); (5) "I do not believe in capital punishment, but I believe it is necessary" (Statement Six); (6) "We must have capital punishment for [some] crimes" (Statement Seven); (7) "Capital punishment is just and necessary" (Statement Twelve); (8) "Capital punishment gives the criminal what he deserves" (Statement Fourteen); and (9) "Capital punishment should be available as punishment for more crimes than it is now" (Statement Seventeen).[220]

The juror was then asked to assume that he or she were on a jury to determine punishment for a defendant who had already been convicted of a very serious crime.[221] The questionnaire instructed the juror to choose one of five statements that would reflect his decision, if the law gave a choice of death, life imprisonment, or some other penalty. Campos checked the first statement, which read, "I cannot vote to assess the death penalty under any circumstances."[222]

---

[219]*See id.*

[220]*See id.*

[221]*See id.*, p. 17.

[222]*See id.*  The juror questionnaire offered the following options, in order: (1) "I cannot vote to assess the death penalty under any circumstances"; (2) "I am opposed to the death penalty but could vote to assess it in a proper case"; (3) "My decision on whether to assess the death penalty would depend upon the facts and circumstances of the case"; (4) "I would usually vote for the death penalty in a case where the law allows me to do so"; and (5) "I would vote to assess the death penalty in every case I

During individual voir dire, the trial court attempted to clarify Campos' position

regarding the death penalty:

| | |
|---|---|
| THE COURT: | . . . [T]hese questions have confused a lot of jurors, and I need to find out: What is your real thinking about capital punishment? |
| MS. CAMPOS: | I'm against it.  I feel like I'm just not a person to judge anybody, and I believe that I can't accuse somebody of something that I don't believe in. |
| | I'm not sure if that's the correct answer, but I just don't believe in it. |
| THE COURT: | If a jury finds a person guilty of capital murder, they will be called upon to answer questions that will determine whether or not the person will be sentenced to life imprisonment [or] to the death penalty. |
| | If they answer the questions – answer the questions that call for the death penalty, then the Judge of the Court is required to assess the death sentence, sentence the defendant to death. |
| | Now, I'm going to ask you as a person – and I'm not trying to suggest one thing at all to you.  I just want to know, based on your answers, you struck me as kind of having two minds about the issue. |
| MS. CAMPOS: | Just confused. |
| THE COURT: | The question is: Would your feelings about the death penalty – what is the term? |
| MR. ROSALES:[223] | Substantially impair. |
| THE COURT: | – substantially impair your ability to answer questions that would lead to the death penalty or lead against the death penalty, fairly, according to the evidence[?] |
| | In other words, you have a right to any opinion you want to have on the situation.  Would your feeling about it keep you from being able to answer the questions according to – as the evidence showed, regardless of whether the death penalty was to be |

---

could." *See id.*

     Campos also stated that she did not want to be a juror in the case because she "ha[d] never been a juror and would not want to accuse any person."  *See* Appendix, Tab 4, juror questionnaire of Susan Campos, p. 18.

     [223]Joe Rosales, Esq., and Rick Locke, Esq., Assistant District Attorneys for El Paso County, Texas, prosecuted the case on behalf of the State of Texas.

| | |
|---|---|
| | administered or not? |
| MS. CAMPOS: | It's something that – I'm against it just like you ask me.  I mean, because that's like I'm confused about that.  I mean, I'm just against all that. |
| MR. MUÑOZ:[224] | Your Honor, may we ask the juror to speak a little louder? |
| MS. CAMPOS: | Okay. |
| THE COURT: | And don't talk to her, talk to us.  She can pick up what you're saying. |
| | What is your – what is your personal stand in terms of the death penalty?  In other words, a person can say, "Well, I don't like the death penalty, but I will rule according to what the facts show."  Or, "My feeling about the death penalty is so strong that I won't go for it no matter what."  Or you can have any other attitude.  You might have the attitude, "Well, I am going to vote the death penalty every time I get the chance." |
| | What is your feeling? |
| MS. CAMPOS: | I just don't believe in the death penalty.  I just don't feel it's right to kill anybody. |
| THE COURT: | Is your feeling so strong – |
| MS. CAMPOS: | Yes, sir. |
| THE COURT: | – that you would be unable to answer the questions honestly, according to what the evidence showed?  I'm talking about – not honestly, but sincerely. |
| MS. CAMPOS: | I'll be honest about it, but I just – I will answer questions, but I just feel very strongly about it.  I don't believe in the death penalty at all.[225] |

After explaining the statutory punishment questions to Campos, the trial judge continued:

| | |
|---|---|
| THE COURT: | . . . Do you have, at this time, a feeling right now how you would answer that question, regardless of what the evidence would show? |
| MS. CAMPOS: | No, sir. |
| THE COURT: | You do not have a feeling right now about how you would answer it? |
| | I want to explain to you that if you answer [the mitigation] question no, then the defendant – the Court will be required to |

---

[224]Maximino Muñoz, Esq., and Jaime Gandara, Esq., represented Gomez at trial.

[225] RR at Vol. 16 of 35, pp. 4-7.

|                    | impose the death sentence.  You understand that? |
|--------------------|---------------------------------------------------|
|                    | I'm asking you, do you have a moral feeling about the death penalty that says, "I can't answer the questions in any way but no, no matter what the evidence shows"? |
| MS. CAMPOS:        | I can't answer that. |
| THE COURT:         | What are you saying? |
| MS. CAMPOS:        | I can't answer it.  I mean I'm just confused more about that question. |
| THE COURT:         | Well, could you ever vote – no matter what the evidence shows, that you could never vote for the death penalty? |
| MS. CAMPOS:        | I wouldn't vote for the death penalty. |
| THE COURT:         | Counsel, do you-all want to talk to – ask her more questions? |
| MR. LOCKE:         | No.  I don't have anything for her, Judge. |
| MR. MUÑOZ:         | Let me ask her a couple of questions, Your Honor. |
| THE COURT:         | Yes, sir. |

[VOIR DIRE EXAMINATION BY MR. MUÑOZ]

| MR. MUÑOZ:         | Ms. Campos, my name is Maximino Daniel Muñoz.  This is Jaime Gandara.  That's our client, Ignacio Gomez. |
|                    | What I have been hearing is that you do not believe in capital punishment. |
| MS. CAMPOS:        | No, I don't. |
| MR. MUÑOZ:         | Are your feelings – could you set aside your feelings and answer these questions fairly and impartially? |
| MR. LOCKE:         | He probably needs to tell her that answering these questions might end up in causing the execution of an individual. |
| MR. MUÑOZ:         | And you have to answer vocally, so this lady down here can register your answers.  And was that a yes? |
|                    | . . . Could you answer those questions? |
| THE COURT:         | I have got to try to figure out some way to present the question. Ma'am? |
| MS. CAMPOS:        | Yes. |
| THE COURT:         | Do you think that there is any crime, kind of crime, that deserves the death penalty? |
| MS. CAMPOS:        | No, I don't. |

42

THE COURT:                     Step outside, please.[226]

In the ensuing argument over the State's challenge to Campos for cause, defense counsel

contended that Campos should not be dismissed because she had stated that she could answer

both questions.[227] The prosecutor acknowledged that Campos had said that she could answer both

questions, but reminded the trial judge that she had also said that she would answer them so that

Gomez never got the death penalty.[228]  The trial judge subsequently granted the State's challenge

for cause.[229]

On direct appeal, the Texas Court of Criminal Appeals noted the special deference

afforded a trial court's decision when a potential juror's answers are vacillating, unclear, or

contradictory, and held that the trial court did not err in granting the State's challenge to Campos

for cause.[230]  Although some of Campos' answers indicated that she would consider the evidence

before answering the special issues, it concluded that the record contained sufficient testimony to

the contrary such that the trial court could reasonably have found that Campos would not have

been able to perform her duties as a juror.[231]

This Court has independently reviewed the record and concludes that the Court of

Criminal Appeals' rejection of Gomez' claim did not result in a decision that was contrary to, or

---

[226]RR at Vol. 16 of 35, voir dire of Susana Campos, pp. 8-13.

[227]See id., p. 13.

[228]See id.

[229]See id., p. 14.

[230]See Gomez v. The State of Texas, No. 73,199, slip op. at 7-8 (Tex. Crim. App. Sept. 20, 2000).

[231]Id.

involved an unreasonable application of *Wainwright*, nor was it based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.

Campos represented the quintessential vacillating juror.  At the very least, her juror questionnaire

suggested a divided mind on the subject of capital punishment and cast legitimate doubt on her

ability to follow the law.  Her testimony during an extended individual voir dire – in which she

asserted in one sentence that she could follow the law, only to contradict that assertion in her

next answer –  did nothing to dispel this doubt.  Given the particular deference allowed a trial

court's determination of juror bias, the record's support of the trial judge's determination, and the

absence of any clear and convincing evidence to the contrary, the Court concludes that Gomez

has failed to show that he is entitled to federal habeas relief on this claim.  **Accordingly, the**

**Court concludes that Gomez' first claim of error lacks merit under the AEDPA**.

> **B.**    ***Claim Two:  Trial counsel was ineffective for failing to prevent the exclusion***
> ***for cause of qualified venire members.***

Gomez alleges that trial counsel was ineffective for failing to prevent the exclusion of

jurors Carson, Garcia, Jaramillo, and Martinez for cause merely because they voiced

conscientious scruples against the death penalty.[232]  For the reasons discussed below, the Court

concludes that Gomez' claim lacks merit under the AEDPA.

> 1.    *Legal Standard – Constitutionally Ineffective Assistance of Counsel*

The Supreme Court established the legal principles that govern ineffective assistance of

---

[232]As discussed earlier in this Memorandum Order and Opinion, the Court concludes that Gomez
has exhausted this claim only as to prospective jurors Carson, Garcia, Jaramillo, and Martinez.

counsel claims in *Strickland v. Washington*.[233]  In *Wiggins v. Smith*,[234] the Supreme Court

reiterated that:

> An ineffective assistance of counsel claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[235]

To establish that counsel's representation fell below an objective standard of

reasonableness, a convicted defendant must overcome a strong presumption that his trial

counsel's conduct fell within a wide range of reasonable professional assistance.[236]  Reviewing

courts are extremely deferential in scrutinizing counsel's performance, making every effort to

eliminate the distorting effects of hindsight.[237]  It is strongly presumed that counsel rendered

adequate assistance and exercised reasonable professional judgment in making all significant

decisions.[238]  An attorney's strategic choices, usually based on information supplied by the

defendant and from a thorough investigation of relevant facts and law, are virtually

---

[233]466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[234]539 U.S. 510, *20, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471, 484 (2003).

[235]*Id.* (internal citations omitted).

[236]*See Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 2473, 91 L. Ed. 2d 144, 159 (1986); *Strickland*, 466 U.S. at 687-91, 104 S.Ct. at 2063-7; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997); *Belyeu v. Scott*, 67 F.3d 535, 538 (5th Cir. 1995).

[237]*See, e.g., Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 844, 122 L. Ed. 2d 180, 190-91 (1993); *Burger v. Kemp*, 483 U.S. 776, 789, 107 S. Ct. 3114, 3123, 97 L. Ed. 2d 638, 654 (1987); *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2066; *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).

[238]*See Strickland*, 466 U.S. at 690; 104 S. Ct. at 2064-7; *Duff-Smith*, 973 F.2d at 1182; *Drew*, 964 F.2d at 422.

unchallengeable.[239]  Counsel is required neither to advance every non-frivolous argument, nor to

investigate every conceivable matter, nor to assert patently frivolous arguments.[240]  A criminal

defense counsel is not required to exercise clairvoyance during the course of a criminal trial.[241]

However, even if counsel's performance falls below an objective standard of

reasonableness, "[a]n error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[242]

Accordingly, "any deficiencies in counsel's performance must be prejudicial to the defense in

order to constitute ineffective assistance under the Constitution."[243]  To establish that he has

sustained prejudice, the convicted defendant "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[239]*See Boyle v. Johnson*, 93 F.3d 180, 187-8 (5th Cir. 1996) (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel was concerned that such testimony would not be viewed as mitigating by the jury and that the prosecution might respond to such testimony by putting on its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson*, 92 F.3d 1385, 1406-9 (5th Cir. 1996) (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews with the defendant and the defendant's family failed to produce any helpful information); *compare Wiggins*, 539 U.S. at *43-4, 123 S. Ct. at 2542 (in capital case, counsel's decision not to expand its mitigation-defense investigation beyond PSI and DSS records, despite suggestions that additional, significant mitigating evidence existed, was itself unreasonable and fell below professional standards).

[240]*See Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point."); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) (stating that "[c]ounsel is not required by the Sixth Amendment to file meritless motions."); *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) (stating that "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources.").

[241]*See Sharp v. Johnson*, 107 F.3d 282, 290 n.28 (5th Cir. 1997) (citing *Garland v. Maggio*, 717 F.2d 199, 207 (5th Cir. 1983) (holding that clairvoyance is not a required attribute of effective representation).

[242]*Strickland*, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674, 695 (1984).

[243]*Id.* at 692, 104 S. Ct. at 2067.

different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."[244]  The Court must consider not merely whether the outcome of the defendant's case would have been different, but also whether counsel's deficient performance *caused* the outcome to be unreliable or the proceeding to be fundamentally unfair.[245]

Because a convicted defendant must satisfy both prongs of the *Strickland* test, his failure to establish either deficient performance or prejudice under that test makes it unnecessary to examine the other prong.[246]  Therefore, a convicted defendant's  failure to establish that his counsel's performance fell below an objective standard of reasonableness avoids the need to consider the issue of prejudice.[247]  Similarly, it is also unnecessary to consider whether counsel's performance was deficient where there is an insufficient showing of prejudice.[248]  Moreover, mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue.[249]

---

[244]*Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *see also Loyd*, 977 F.2d at 159; *Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir. 1992).

[245]*Lockhart v. Fretwell*, 506 U.S. 364, 368-73, 113 S. Ct. 848, 841-5 (1993), 122 L. Ed. 2d 180, 188-91 (emphasis added) ("[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him"); *Lackey v. Johnson*, 116 F.3d at 152.

[246]*See Strickland*, 466 U.S. 668, 700, 104 S. Ct. 2052, 2071, 80 L. Ed. 2d 674, 702 (1984); *Green*, 116 F.3d at 1122; *see also Burnett v. Collins*, 982 F.2d at 928 (holding that the defendant bears the burden of proof on both prongs of the *Strickland* test).

[247]*Hoskins*, 910 F.2d at 311; *Thomas*, 812 F.2d at 229-30.

[248]*See Black*, 962 F.2d at 401; *Pierce*, 959 F.2d at 1302.

[249]*See Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir. 1994) (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief).

2.    *Discussion*

To determine whether trial counsel performed deficiently in failing to prevent the

exclusion for cause of Carson, Garcia, Jaramillo, and Martinez, this Court must first examine the

threshold issue (*i.e.*, whether these prospective jurors were improperly excluded for cause due to

their opposition to the death penalty).  Counsel can only be said to have performed deficiently in

this respect if these prospective jurors were unconstitutionally excluded from jury service due to

their views on the death penalty.  For the reasons discussed below, the Court concludes that

Gomez has failed to meet the first prong of the *Strickland* test for ineffective assistance because

he has not shown that counsel performed deficiently.  The Court therefore also concludes that

Gomez has not satisfied his burden by showing that the state habeas court's rejection of this

claim resulted in a decision that was contrary to clearly established federal law or an

unreasonable application of such law to the facts before it.

Gomez' claims are best evaluated in context.  Accordingly, the Court will set forth the

responses to the jury questionnaire and voir dire exchanges verbatim for all four jurors and then

discuss Gomez' claim as a whole.

a.  Joanna Carson

Like Susana Campos, Carson agreed with the statement on the jury questionnaire that she

neither generally opposed or favored capital punishment.[250]  Carson seemingly took a more

flexible position than Campos when answering what she would do if charged with determining

punishment, given a choice of death, life imprisonment, or some other penalty.  Where Campos

stated that she could never vote to assess the death penalty, Carson indicated that her "decision

---

[250]*See* Appendix, Tab 5 (Juror questionnaire of Joanna Carson), p. 15.

on whether to assess the death penalty would depend upon the facts and circumstances of the case."[251]

Regarding the list of seventeen statements expressing different attitudes toward capital punishment, Carson's responses were somewhat contradictory. She agreed with the following statements: (1) "I think capital punishment is necessary but I wish it were not" (Statement One); (2) "We must have capital punishment for [some] crimes" (Statement Seven); and (3) "Capital punishment is just and necessary" (Statement Twelve).[252]

Carson disagreed with the remaining statements: (1) "Any person, man or woman, young or old, who commits capital murder should pay with his own life" (Statement Two); (2) "Capital murder punishment is wrong, but it is necessary in our imperfect civilization" (Statement Three); (3) "Every criminal should be executed" (Statement Four); (4) "Capital punishment has never been effective in preventing crime" (Statement Five); (5) "I do not believe in capital punishment, but I believe it is necessary" (Statement Six) (6) "I do not believe in capital punishment under any circumstances" (Statement Eight); (7) "Capital punishment is not necessary in modern civilization" (Statement Nine); (8) "Life imprisonment is more effective than capital punishment" (Statement Ten) (9) "Execution of criminals is a disgrace to civilized society" (Statement Eleven); (10) "I do not believe in capital punishment, but I do not believe it should be abolished" (Statement Thirteen); (11) "Capital punishment gives the criminal what he deserves (Statement Fourteen); (12) "The State cannot teach the sacredness of human life by destroying it" (Statement Fifteen); (13) "Capital punishment is justified only for premeditated murder

---

[251]*See id.*, p. 17.

[252]*See id.*, pp. 16-7.

(Statement Sixteen); and (14) "Capital punishment should be available as punishment for more crimes than it is now" (Statement Seventeen).[253]

The record reflects the following exchange during Carson's individual voir dire:

| | |
|---|---|
| MR. ROSALES: | I just want to cover a couple of things that I noticed that you answered in your questionnaire, first. |
| | You said, "Capital murder punishment is wrong" – you remember that list of things that you had to agree with or disagree? |
| MS. CARSON: | Yes. |
| MR. ROSALES: | "Capital punishment is wrong, but it is necessary in our imperfect civilization," |
| | And you said, "I disagree with that." |
| | I realize that it's kind of a dual question that we have got going there. Can you kind of explain to me why you disagree with that particular statement? |
| MS. CARSON: | I think in a civilized society, to choose to put someone to death, regardless of the crime they committed, seems tremendously inhumane to me. Yet, if I were voting to keep the death penalty in Texas or not, I would probably vote to keep it. |
| | So – I know that's contradictory. It's never touched me before personally. |
| MR. ROSALES: | Let me put the issue to you this way. And I think this is the way a lot of people understood it. I think what you're telling me is that – and correct me if I'm mistaken – as an academic exercise, you think that there should be capital punishment, but – |
| MS. CARSON: | You know, more as an economic exercise, I think as far as – just what it costs to keep someone in prison for life – and I mean, honestly, more for economic's sake, I would say I would. |
| MR. ROSALES: | Okay. That's fair. I think that sometimes it's not necessarily contradictory to separate your moral feelings about something with other concerns that you have for different reasons. Let me put it this way. This is the simplest way that I could ask you. |
| | Do you think you could serve on a jury where you might be asked to impose the death penalty? |
| MS. CARSON: | I don't know. I have thought about it. I got a call on Friday to |

---

[253] See id., pp. 16-7.

|  | come back, and I have thought about it all weekend long.  I honestly don't know if I could vote for the death penalty. |
|---|---|
| MR. ROSALES: | Okay.  Let me explain a couple of things.  First of all, this is really the only chance that we're going to have to talk about this.  The worst thing that could happen, I think, would be to end up on a jury and realize after you're on the jury panel that you have a particular issue – whatever given issue that is – is something that you just can't consider or can't do. |
| MS. CARSON: | Yes. |
| MR. ROSALES: | Because by then it's too late to talk about it.  And you know, this is a chance for you to figure out how you feel and not be in that position, and for us, too. |
| MS. CARSON: | Yes. |
| MR. ROSALES: | Because each side wants a fair shake.  So here's the thing.  I know you're saying at this point, I don't think so, but I kind of have to. |
| MS. CARSON: | Could I do it? |
| MR. ROSALES: | I'm forced to ask you could you be more definite than that. |
| MS. CARSON: | I could not.  On the questionnaire some of the questions asked about if the jury came to understand that the upbringing of a particular person, a defendant had, was perhaps abusive, or would that make you consider those things in determining what punishment should be or how accountable that person should be held for their actions.  And I think I would truly take that into account. |
| MR. ROSALES: | All right.  Well, let's talk some more about that. |
| THE COURT: | Ma'am, nobody is asking you would you find it hard.  The question is – |
| MS. CARSON: | Could I do it? |
| THE COURT: | Would your internal feeling about responsibility for causing the death penalty to be imposed materially substantially impair your ability to answer the questions – |
| MS. CARSON: | Yes, sir. |
| THE COURT: | – which would determine the death penalty or life imprisonment.  That's the question. |
| MS. CARSON: | I would not vote for the death penalty. |
| THE COURT: | Okay. |
| MR. ROSALES: | I'll go ahead and pass this juror.  Thank you. |
| MR. MUNOZ: | We pass the juror, Your Honor.  We have no questions. |

| THE COURT: | Ma'am, go outside just a moment. |
|---|---|

[JUROR OUT OF THE COURTROOM.]

| THE COURT: | Does the State have a motion to strike for cause? |
|---|---|
| MR. ROSALES: | I challenge this juror for cause on the basis she cannot consider the death penalty. |
| THE COURT: | Defense have anything to say? |
| MR. GANDARA: | No, Your Honor. |
| THE COURT: | All right.  Have her come back. |

[JUROR IN THE COURTROOM.]

| THE COURT: | Mrs. Carson, you have been stricken for cause in the case and you are now liberated from attention to us.[254] |
|---|---|

### b. Maria Garcia

Maria Garcia's responses to the jury questionnaire reflected a much more consistent attitude toward capital punishment than did Carson's.  Garcia chose the statement, "I am opposed to capital punishment under any circumstances," as the one best summarizing her general views about the death penalty.[255]  She responded to the list of seventeen statements expressing different attitudes toward capital punishment accordingly. She disagreed with the statements: (1) "I think capital punishment is necessary but I wish it were not" (Statement One); (2) "Any person, man or woman, young or old, who commits capital murder should pay with his own life" (Statement Two); (3) "Capital murder punishment is wrong, but it is necessary in our imperfect civilization" (Statement Three); (4) "Every criminal should be executed" (Statement Four); (5) "Capital punishment has never been effective in preventing crime" (Statement Five); (6) "I do not believe in capital punishment, but I believe it is necessary" (Statement Six); (7) "We must have capital

---

[254]RR at Vol. 18 of 35, voir dire of Joan Carson, pp. 157-61.

[255]*See* Appendix, Tab 6, juror questionnaire of Maria Garcia, p. 15.

punishment for [some] crimes" (Statement Seven); (8) "Capital punishment is just and necessary" (Statement Twelve); (9) "I do not believe in capital punishment, but I do not believe it should be abolished" (Statement Thirteen); (10) "Capital punishment gives the criminal what he deserves" (Statement Fourteen); (11) "Capital punishment is justified only for premeditated murder" (Statement Sixteen); and (12) "Capital punishment should be available as punishment for more crimes than it is now" (Statement Seventeen).[256]

Garcia agreed with the statements: (1) "I do not believe in capital punishment under any circumstances" (Statement Eight); (2) "Capital punishment is not necessary in modern civilization" (Statement Nine); (3) "Life imprisonment is more effective than capital punishment" (Statement Ten); (4) "Execution of criminals is a disgrace to civilized society" (Statement Eleven); and (5) "The State cannot teach the sacredness of human life by destroying it" (Statement Fifteen).[257]  Like Campos, when answering what she would do if charged with determining punishment, given a choice of death, life imprisonment, or some other penalty statement, Garcia indicated that she could never vote to assess the death penalty.[258]

The relevant portion of Ms. Garcia's voir dire examination follows:

THE COURT:                    Ms. Garcia, reading your questionnaire here, there's a question I
                              need to ask you.  You say, "I cannot vote to assess the death
                              penalty under any circumstances."

---

[256]*See id.*, pp. 16-7.

[257]*See id.*

[258]*See id.*, p. 17.  Garcia also stated that she would be prevented from being a fair and impartial juror in the case because "[she didn't] believe in capit[a]l murder, God gave life and he is the only one that can take it."  *See* Appendix, Tab 6, juror questionnaire of Maria Garcia, p. 18.  She also stated that she did not want to be a juror "because he has a big possibility of receiving capit[a]l murder because of the charges."  *See id.*

|  | Let's assume that you are in a case and the defendant has been convicted of capital murder, which is a possible punishment for which is the death penalty [*sic*]. And the jury is called upon to answer questions that will determine whether or not the Judge of the Court is to impose the death sentence or life in prison. In a capital murder case, that's the only two possible punishments. Taking into consideration any aggravated circumstances you can think of, however evil the person might be, are you saying there is no way you could ever vote the death penalty? |
|---|---|
| MS. GARCIA: | Correct. |
| THE COURT: | Counsel, you-all want to question her? |
| MR. LOCKE: | No questions. |
| MR. GANDARA: | No questions, Your Honor. |
| THE COURT: | Thank you, ma'am, you go outside just a minute, please. |
|  | [JUROR OUT OF THE COURTROOM.] |
| THE COURT: | Is there a motion to strike? |
| MR. LOCKE: | Your Honor, the State has a motion to strike for cause, if she's not able to follow the law. |
| THE COURT: | Counsel for Defense, you want to argue the motion? |
| MR. GANDARA: | No, I have no argument, Your Honor. |
| THE COURT: | The Court grants the State's motion to strike for cause.[259] |

c. Luis F. Jaramillo

Mr. Jaramillo chose the statement, "I am opposed to capital punishment under any circumstances," as the one best summarizing his general views about the death penalty.[260] He agreed with the statements: (1) "I think capital punishment is necessary but I wish it were not" (Statement One); (2) "I do not believe in capital punishment, but I believe it is necessary" (Statement Six); (3) "I do not believe in capital punishment under any circumstances" (Statement Eight); (4) "Capital punishment is not necessary in modern civilization" (Statement Nine); and

---

[259] *See* RR at Vol. 19 of 35, voir dire of Maria Garcia, pp. 103-5.

[260] *See* Appendix, Tab 7, juror questionnaire of Luis F. Jaramillo, p. 15.

(5) "Life imprisonment is more effective than capital punishment" (Statement Ten).[261]

He disagreed with the statements: (1) "Any person, man or woman, young or old, who commits capital murder should pay with his own life" (Statement Two); (2) "Capital murder punishment is wrong, but it is necessary in our imperfect civilization" (Statement Three); (3) "Every criminal should be executed" (Statement Four); (4) "Capital punishment has never been effective in preventing crime: (Statement Five); (5) "We must have capital punishment for [some] crimes" (Statement Seven); (6) "Execution of criminals is a disgrace to civilized society" (Statement Eleven); (7) "Capital punishment is just and necessary" (Statement Twelve); (8) "I do not believe in capital punishment, but I do not believe it should be abolished" (Statement Thirteen); (9) "Capital punishment gives the criminal what he deserves" (Statement Fourteen); (10) "The State cannot teach the sacredness of human life by destroying it" (Statement Fifteen); (11) "Capital punishment is justified only for premeditated murder" (Statement Sixteen); and (12) "Capital punishment should be available for more crimes than it is now" (Statement Seventeen).[262]  Like Campos and Garcia, Jaramillo indicated that he "could not vote to assess the death penalty under any circumstances" if he were on a jury to determine punishment for a defendant who had been found guilty of capital murder.[263]

The relevant portion of Mr. Jaramillo's individual voir dire follows:

---

[261]*See id.*, pp. 16-7.

[262]*See id.*

[263]*See id.*, p. 17.  Jaramillo also stated that he would be prevented from being a fair and impartial juror because "[he did] not believe in murder."  *See* Appendix, Tab 7, juror questionnaire of Luis F. Jaramillo, p. 18.  However, he also indicated that he would like to be a juror because he had never been one before.  *See id.*

| | |
|---|---|
| THE COURT: | For the record, you are Luis F. Jaramillo? |
| MR. JARAMILLO: | Yes, sir. |
| THE COURT: | Mr. Jaramillo, in your questionnaire, you checked this – that you – "I cannot vote to assess the death penalty under any circumstances." |
| MR. JARAMILLO: | Yes, I did. |
| THE COURT: | Let me explain what a jury does.  If a jury finds a defendant guilty of capital murder, the jury would be called upon to answer two or more questions, sometimes, which would determine whether or not the Judge would be required to assess the death penalty or life imprisonment, one way or the other. |
| | The first question the jury would have to answer – this is assuming they have found some defendant guilty of capital murder.  I'm not talking about the case before us – but – |
| MR. JARAMILLO: | Yes. |
| THE COURT: | – in some case.  The first question that would be asked would be, "Do you find from the evidence, beyond a reasonable doubt, that there is a probability that the defendant would commit acts of violence that would constitute a continuing threat to society? |
| | Now, if a jury finds – the jury votes unanimously yes for that question, then the question of whether or not to assess the death penalty would remain viable.  If they said no, the trial would be over and the Judge would assess a person to life imprisonment. |
| | If they find yes to that first question, if a jury – some jury – finds yes to that first question, then they say, "Do you find" – then they're asked another question.  "Do you find from the evidence, taking into consideration the defendant's character and background and the personal moral culpability of the defendant, that there is sufficient mitigating circumstances that a sentence of life imprisonment rather than death be imposed?" |
| | If a jury answers yes to that question, then the Court would assess life – would automatically assess the life imprisonment.  If they say no to that question, after having answered yes to the first question, then the duty of the Court would be to assess the death penalty. |
| | Now, I take it from – I'm not suggesting that it would be easy for anyone who was a normal human being to vote for the death penalty in a case.  But the question I have to understand is, is your feeling such that you would never, no matter what the evidence might say, vote for the death penalty, to give answers that would bring about the death penalty? |

| | |
|---|---|
| MR. JARAMILLO: | Well, I would not vote for the death penalty. |
| THE COURT: | You just do not believe you could ever vote – |
| MR. JARAMILLO: | No, I don't go for that. |
| THE COURT: | Counsel for the State, do you want to ask him any questions on the issue? |
| MR. ROSALES: | Was his answer that he could never vote for that? I couldn't understand him. |
| MR. JARAMILLO: | I will never vote for the death penalty. |
| MR. ROSALES: | You would not? |
| MR. JARAMILLO: | No. |
| MR. ROSALES: | I don't have any questions. |
| THE COURT: | Defense have any questions? |
| MR. MUÑOZ: | No questions, Your Honor. |
| THE COURT: | Step outside just a minute, sir. |
| | [JUROR OUT OF THE COURTROOM.] |
| THE COURT: | Is there a motion from the State to strike for cause? |
| MR. ROSALES: | State challenges the juror for cause, Your Honor. |
| THE COURT: | Granted.[264] |

### d. Miguel P. Martinez

Mr. Martinez chose the statement, "I am opposed to capital punishment under any circumstances," as the one best summarizing his attitude toward the death penalty.[265] He agreed with the following statements: (1) "Capital punishment has never been effective in preventing crime" (Statement Five); (2) "I do not believe in capital punishment under any circumstances" (Statement Eight); (3) "Capital punishment is not necessary in modern civilization" (Statement Nine); (4) "Life imprisonment is more effective than capital punishment" (Statement Ten); (5)

---

[264]RR at Vol. 20 of 35, voir dire of Luis F. Jaramillo, p. 139-43.

[265]*See* Appendix, Tab 8, juror questionnaire of Miguel P. Martinez, p. 15.

"Execution of criminals is a disgrace to civilized society" (Statement Eleven); and (6) "The State cannot teach the sacredness of human life by destroying it" (Statement Fifteen).[266]

He disagreed with these statement: (1) "I think capital punishment is necessary but I wish it were not" (Statement One); (2) "Any person, man or woman, young or old, who commits capital murder should pay with his own life" (Statement Two); (3) "Capital murder punishment is wrong, but it is necessary in our imperfect civilization" (Statement Three); (4) "Every criminal should be executed" (Statement Four); (5) "I do not believe in capital punishment, but I believe it is necessary" (Statement Six); (6) "We must have capital punishment for [some] crimes" (Statement Seven); (7) "Capital punishment is just and necessary" (Statement Twelve); (8) "I do not believe in capital punishment, but I do not believe it should be abolished" (Statement Thirteen); (9) "Capital punishment gives the criminal what he deserves" (Statement Fourteen); (10) "Capital punishment is justified only for premeditated murder" (Statement Sixteen); and (11) "Capital punishment should be available as punishment for more crimes than it is now" (Statement Seventeen).[267]  He, like Campos, Garcia, and Jaramillo,  indicated that he "could not vote to assess the death penalty under any circumstances" if he were on a jury to determine punishment for a defendant who had been found guilty of capital murder.[268]

The record reflects the following exchange during Martinez' individual voir dire:

THE COURT:                      For the record, are you Miguel P. Martinez?

---

[266]*See id.*, pp. 16-7.

[267]*See id.*

[268]*See id.*, p. 17.  Martinez also stated that he would be prevented from being a fair and impartial juror because of the murder of a family member and because he did not believe in capital punishment. *See id.*, p. 18.

| | |
|---|---|
| MR. MARTINEZ: | Yes, I am. |
| THE COURT: | Mr. Martinez, in answering your questions, the questionnaire that was given to you – |
| MR. MARTINEZ: | Yes, sir. |
| THE COURT: | – you made a check mark under, "I am opposed to capital punishment under any circumstances"? |
| MR. MARTINEZ: | Yes, I am. |
| THE COURT: | Now, are you saying that no matter how horrible the crime, you will still be opposed to capital punishment? |
| MR. MARTINEZ: | Yes, I am. |
| THE COURT: | No matter how horrible the record of the defendant, you would still be opposed to the capital punishment? |
| MR. MARTINEZ: | Yes, I am. |
| THE COURT: | Counsel for the State, do you want to ask questions on the issue? |
| MR. ROSALES: | Not on that issue, Your Honor. |
| THE COURT: | Counsel for the Defense? |
| MR. GANDARA: | No, Your Honor, we don't have any questions of Mr. Martinez. |
| THE COURT: | If you would go outside just a minute, sir. |
| | [JUROR OUT OF THE COURTROOM.] |
| THE COURT: | State have a motion to strike? |
| MR. ROSALES: | Yes, Your Honor, we challenge this juror. |
| THE COURT: | Defense wish to argue the motion? |
| MR. LOCKE: | We – excuse me, Your Honor. We challenge him for two reasons, Your Honor. He also said in his questionnaire that he heard of this case through the news media, that he already had developed an opinion as to the guilt or innocence of the defendant, and then he answered that he could not set that opinion aside. So we challenge for that reason, also. |
| MR. GANDARA: | Your Honor, none of those latter matters were developed for the record. There was only one matter developed on the record with this man, and that is that he was opposed to the death penalty. |
| THE COURT: | What, sir? |
| MR. GANDARA: | There was only – Counsel's objections – rather, additional challenges for cause, are based on some reading or another of his questionnaire. |
| THE COURT: | I will rule solely on – I was just asked for the one issue. He said – |

| | |
|---|---|
| | right now, do you-all have anything to say about the one issue? |
| MR. GANDARA: | No, Your Honor. |
| THE COURT: | Okay. On the ground – the first ground granted. On his testimony, I discharge him, disqualify him.[269] |

The state habeas court made a factual finding that prospective jurors Carson, Garcia, Jaramillo, and Martinez were "unalterably opposed to the death penalty under any circumstances, and that those prospective jurors' categorical opposition to the death penalty and inability to vote to impose the death penalty under any circumstances were even more apparent from the record than were prospective juror Susana Campos' attitudes and beliefs in that regard."[270] It further found that Gomez had failed to allege any facts suggesting that trial counsel could have done anything to prevent the exclusion of these prospective jurors for cause or to change their minds regarding their categorical opposition to and refusal to impose the death penalty.[271]

The state habeas court's factual determinations enjoy a presumption of correctness under 28 U.S.C. 2254(e)(1), absent clear and convincing evidence to the contrary.[272] "The presumption

---

[269]*See* RR at Vol. 21 of 35, voir dire of Miguel P. Martinez, pp. 112-5.

[270]*See Ex parte Gomez,* Findings of Fact and Concl. of Law, p. 6 ¶ 29.

[271]*Id.,* p. 6 ¶ 30.

[272]To the extent Gomez emphasizes, regarding this and his other claims, that the judge who presided over his state habeas proceeding was not the same as the judge who presided at voir dire and that this judge held only a "paper" hearing in lieu of a full evidentiary hearing, these facts have little, if any, impact on the degree of deference this Court must afford the state habeas court's factual findings. *See Valdez v. Cockrell,* 274 F.3d 941, 951 (5th Cir. 2001). "The AEDPA requires that we presume correct the habeas court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.' This is so even if the hearing was a 'paper' hearing and may not have been full and fair." *Morrow v. Dretke,* 367 F.3d 309, 315 (5th Cir. 2004) (internal citations and quotations omitted). "[A] full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Valdez v. Cockrell,* 274 F.3d at 951. While this Court does not find any deficiency in the paper hearing held by the state habeas judge, it notes that, even if it did, the deference owed to a state habeas

of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state's conclusions of mixed law and fact."[273] This Court's initial inquiry under 28 U.S.C. § 2254(e)(1), then, is solely whether Gomez has shown by clear and convincing evidence that the trial court's factual determination – that the four prospective jurors were unalterably opposed to the death penalty and unable to vote to impose the death penalty under any circumstances – was incorrect. After careful consideration, the Court concludes that Gomez has not carried his burden. The record, on its face, clearly supports the state habeas court's factual findings and Gomez has failed to come forward with any, much less clear and convincing, evidence to rebut it. Accordingly, this Court must presume that the state habeas court correctly determined that these jurors were unalterably opposed to the death penalty and unable to impose it under any circumstances.

Based on these factual findings, the presumptive correctness of which he has failed to rebut with any evidence, the state habeas court concluded that Gomez had failed to show that the trial court abused its discretion by dismissing prospective jurors Carson, Garcia, Jaramillo, and Martinez.[274] The state habeas court therefore also concluded that Gomez had failed to show that his trial counsel performed deficiently in failing to object to the jurors' dismissal for cause.[275] It

---

court's factual findings is not dependent on the quality of the state court's evidentiary hearing. *See id.*; *but see Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (post-AEDPA but pre-*Valdez* decision suggesting that federal courts should afford even stronger deference to a paper hearing where the trial judge and the state habeas judge are the same).

[273]*Valdez*, 274 F.3d at 948 n.11.

[274]*See* Findings of Fact and Concl. of Law, p. 17 ¶ 4.

[275]*See id.* Gomez himself concedes that counsel would not have performed deficiently if he failed to oppose the exclusion of a venire member who averred that he could not impose the death penalty under any circumstances, even if his answers were somewhat equivocal. *See* Pet'r Br. at 40 (citing

further concluded that Gomez had failed to demonstrate prejudice because he had failed to come forward with any facts to show that counsel could have prevented the jurors' exclusion or that he could have somehow made these jurors retreat from their opposition to capital punishment.[276]

If, as the record supports, the state habeas court found, and Gomez has failed to rebut, these jurors were unalterably opposed to the death penalty, then their exclusion was entirely proper under *Wainwright v. Witt* and counsel cannot be said to have performed deficiently by failing to raise a frivolous objection. Moreover, even if counsel had raised this legally baseless objection, it would have been properly overruled. Further, Gomez has come forward with no evidence to show that any of these jurors would have changed their minds or their stated inability to impose capital punishment under any circumstances, no matter how vigorously counsel might have questioned them. Lastly, the Court notes that Gomez has also failed to present this Court with any evidence to overcome *Strickland*'s presumption that counsel's decision not to oppose these jurors' dismissal for cause was anything other than the product of reasonable professional judgment. In the absence of any evidence suggesting that counsel's decision was objectively unreasonable, *Strickland*'s presumption of constitutionally adequate assistance must prevail.

For these reasons, this Court independently concludes that Gomez' complaint about this aspect of counsel's performance satisfies neither of *Strickland*'s two prongs. Therefore, the state habeas court's rejection on the merits of Gomez' ineffective assistance claim was neither contrary to, nor an unreasonable application of, clearly established federal law concerning ineffective assistance, nor based on an unreasonable determination of the facts from the evidence

---

*Williams v. Collins*, 16 F.3d 626, 632-33 (5th Cir. 1994)).

[276]See Findings of Fact and Concl. of Law, pp. 17-8 ¶¶ 5-7.

before it.  **Accordingly, the Court concludes that Gomez' second claim of error lacks merit under the AEDPA.**

### C.    *Claim Three: Gomez' execution would violate the Eighth Amendment.*

Counsel argues that Gomez has always been a person of limited intelligence, due to or exacerbated by a serious fall and head trauma he suffered as a child.[277]  He asserts that the trauma left Gomez with certain cognitive deficits which grow worse when he is placed under emotional stress.[278]  Counsel indicates that Gomez's condition has steadily deteriorated since Gomez' arrival at the Ellis Unit in Huntsville.[279]  Counsel states that his client currently suffers from auditory hallucinations and does not know that he has been sentenced to death or why.[280] Therefore, argues counsel, the Supreme Court's holding in *Ford v. Wainwright*, 477 U.S. 399 (1986), forbids Gomez' execution.[281]  He asks this Court to hold an evidentiary hearing to determine whether Gomez is presently incompetent to be executed.[282]

Counsel raised this claim in Gomez' state habeas writ, but the trial court expressly declined to make any factual findings on the issue, concluding that the matter was not yet ripe for

---

[277]Counsel states that Gomez fell from a second story window when he was approximately 9 years old and slipped into a coma for approximately one week. *See* Pet'r Br., p. 44.  He suffered a second head trauma as an adult due to a car accident. *See id.*

[278]*See* Pet'r Br., p. 44.

[279]*See id.*

[280]*See id.*, p. 45.

[281]*See id.* p. 42.

[282]*See id.*, pp. 47-8.

consideration since Gomez' execution was not then imminent.[283]  Counsel concedes that Texas

law, specifically *Colburn v. State*, 966 S.W.2d 511, 513 (Tex. Crim. App. 1998), supports the

state habeas court's ruling.[284]  Counsel further concedes that, under *Stewart v. Martinez-Villareal*,

523 U.S. 637 (1998), this Court's dismissal of his *Ford* claim as premature will not bar Gomez

from reasserting it in another federal writ petition, if and when the State of Texas adjudicates his

incompetency claim on the merits.[285]  He argues, however, that state law, holding that a claim of

competency to be executed does not become ripe for adjudication until execution is imminent,

does not bind this Court, which is free to rule on his claim if it wishes.[286]

In rebuttal, Respondent argues that, in *Stewart v. Martinez-Villareal*, the Supreme Court

"held that no determination of execution competency can be made until the execution is

imminent."[287]  Because no execution date had been set when Gomez raised his claim before the

state habeas court, Respondent argues, his execution was not imminent.[288]  Therefore,

Respondent continues, Gomez has failed to show that, in dismissing the claim as premature, the

state habeas court unreasonably applied clearly-established federal law as established by the

Supreme Court.[289]  Moreover, since there is currently no execution date set for Gomez, argues

Respondent, this Court is therefore prohibited by *Stewart v. Martinez-Villareal* from making any

---

[283]*See* Findings of Fact and Concl. of Law, p. 9 ¶ 45.

[284]*See* Pet'r Br., p. 47-8.

[285]*See id.*

[286]*See id.*, p. 48.

[287]*See* Resp't Ans., p. 39.

[288]*See id.*

[289]*See id.*

determination regarding Gomez' competency.[290]  Respondent acknowledges that Gomez must

raise his *Ford* claim in his instant federal Petition in order to preserve it for later review, but

insists that, once an execution date is set, Gomez must first pursue relief in state court pursuant to

Texas Code of Criminal Procedure article 46.05.[291]  That provision outlines the specific

procedure to be followed when a prisoner sentenced to death claims that he is incompetent to be

executed.[292]

    *1.*    *Legal Standard – incompetency to be executed pursuant to <u>Ford v. Wainwright</u>*

The Supreme Court held in *Ford v. Wainwright* that the 8th Amendment prohibits a state

from executing an individual who is insane.[293]  In his concurring opinion, Justice Powell

articulated a standard for determining whether a condemned prisoner is competent to be

executed: at a minimum, the individual must know "the fact of [his] impending execution and the

reason for it."[294]

> If the defendant perceives the connection between his crime and his punishment,
> the retributive goal of the criminal law is satisfied, and only if the defendant is
> aware that his death is approaching can he prepare himself for his passing.
> Accordingly, I would hold that the Eighth Amendment forbids the execution only
> of those who are unaware of the punishment they are about to suffer and why they
> are to suffer it.[295]

---

[290]*See id.*

[291]*See id.*, pp. 40-1.

[292]*See id.*

[293]477 U.S. 399, 409-10 (1986).

[294]477 U.S. at 422 (Powell, J., concurring).

[295]*Id.*  Justice Powell further explains that a petitioner claiming insanity must overcome a
presumption of competency:

Justice Powell's statement has become the de facto test in the Fifth Circuit for determining the defendant's competency to be executed.[296]

2.      Discussion

After careful consideration, the Court agrees with Respondent that Gomez' *Ford* claim is unripe for adjudication because his execution is not imminent.  The Court therefore declines Gomez' invitation to hold an evidentiary hearing and concludes that his *Ford* claim should be dismissed without prejudice as premature.  Having properly preserved the issue, he will not be prevented from reasserting his *Ford* claim in a subsequent federal writ petition.[297]  **Accordingly, Gomez' third claim for relief is dismissed without prejudice as premature.**

D.      ***Claim Four: Gomez' Sixth Amendment right to effective assistance of counsel was violated at the punishment phase because trial counsel did not present readily available mitigation evidence.***

As discussed regarding Gomez' third claim for relief, counsel argues that Gomez suffers from serious neurological deficits, produced by several significant head injuries during his life.[298]

---

[A] petitioner does not make his claim of insanity against a neutral background. On the contrary, in order to have been convicted and sentenced, petitioner must have been judged competent to stand trial, or his competency must have been sufficiently clear as not to raise a serious question for the trial court. The State therefore may properly presume that petitioner remains sane at the time sentence is to be carried out and may require a substantial threshold showing of insanity merely to trigger the hearing process.

See *Ford*, 477 U.S. at 425-6.

[296]*See Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir. 1988).

[297]*See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998).

[298]*See* Pet'r. Br., p. 50.

66

Counsel asserts that these deficits render Gomez especially sensitive to stressful situations.[299] Under stress, Gomez' mental stability deteriorates and he loses his usual grasp of reality, manifesting otherwise uncharacteristic aggression towards others.[300] He states that trial counsel was aware of these injuries and of Gomez' social history, but failed to investigate them further to determine to what extent they might have influenced Gomez' behavior during the offense.[301] If trial counsel had investigated these issues, he would have learned that Gomez probably lost control of himself from the stress of learning that his mother had been terrorized the night before, that his thinking became disordered as a result of the permanent injury to his brain, and that he reacted without appreciating or considering the gravity or consequences of his behavior.[302]

Counsel further asserts that trial counsel's failure to adequately investigate Gomez' medical history was especially serious because trial counsel actually had engaged a neurologist to evaluate Gomez in order to illustrate that his limited intelligence and education left him unable to understand the inculpatory statement procured from him by law enforcement officers.[303] He argues that such testing would have disclosed that Gomez is less responsible for his anti-social behavior than others who have not suffered the kind of head injuries that have incapacitated him throughout virtually his entire life.[304] This information, in conjunction with testimony from

---

[299] See id.

[300] See id.

[301] See id., pp. 50-1.

[302] See id., p. 51.

[303] See id.

[304] See id., pp. 51-2.

Gomez' friends and relatives, describing his hard work in support of his family and community, and his recovery from alcohol abuse, could have made Gomez' sudden violence more comprehensible to the jury, explaining how a characteristically responsible man could jeopardize everything he had worked for by murdering three boys in plain sight for nothing more than some broken windows.[305]  Ultimately, counsel asserts, it could have constituted sufficient mitigating evidence in the minds of the jurors such that they would have assessed a life sentence rather than the death penalty.[306]

### 1.  The state habeas court's factual findings and legal conclusions

The state habeas court made the following, extensive factual determinations regarding Gomez' instant ineffective assistance of counsel claim.  More than a year before Gomez' trial, trial counsel filed a motion for psychiatric examination to determine Gomez' competency and sanity.[307]  Therein, trial counsel asserted that he believed there was a question regarding Gomez' competency.[308]  The trial court granted the motion and appointed two psychiatrists, Mariam Marvasti, M.D., and David Briones, M.D., to examine Gomez.[309]  Dr. Briones examined Gomez on October 23, 1997 and  Dr. Marvasti examined him on October 28, 1997.[310]  They each filed a

---

[305]*See id.*, pp. 48, 51-2.

[306]*See* Findings of Fact and Concl. of Law, p. 9 ¶ 47.

[307]*See id.*

[308]*See id.*, p. 10 ¶ 48.

[309]*See id.*, p. 10 ¶¶ 49-50.

[310]*See id.*

written report with the trial court.[311]  Marvasti and Briones independently concluded that Gomez was competent to stand trial, although Briones also noted that Gomez possessed only "borderline intellectual functioning."[312]

Trial counsel requested that Gomez be further examined.[313]  The trial court granted the request and on January 6, 1998, ordered that Gomez be examined for "IQ evaluation regarding competency and incompetency" by Peter Fernandez, Ph.D, a clinical psychologist.[314]  Dr. Fernandez examined Gomez on January 29, 1998 and filed a written report with the trial court.[315]  Therein, he stated that both Gomez and Gomez' wife reported that he had suffered a serious childhood head injury that left him in a coma for some time.[316]  Fernandez concluded that applicant possessed "borderline intellectual functioning," but that he was nonetheless competent to stand trial.[317]  Fernandez duly noted that, in reaching his conclusion, he had relied on Dr. Marvasti's prior report as well as his own examination of Gomez.[318]

Based on Dr. Fernandez' report of possible brain injury, trial counsel filed a motion requesting the Court to appoint a neurologist to examine Gomez for possible neurologic

---

[311]*See id.*

[312]*See id.*, p. 10 ¶ 51.

[313]*See id.*

[314]*See id.*, p. 10 ¶¶ 52-3.

[315]*See id.*, p. 10 ¶ 53.

[316]*See id.*, p. 10-1 ¶ 54.

[317]*See id.*, p. 11 ¶ 55.

[318]*See id.*, p. 11 ¶ 56.

deficiencies.[319]  Before the trial court ruled on the motion, trial counsel located Albert Cuetter,

M.D., and confirmed that he would be willing to undertake such an examination.[320] The trial

court granted trial counsel's motion, and on March 4, 1998, appointed Dr. Cuetter to perform a

neurological examination.[321]

Dr. Cuetter examined Gomez on March 18, 1998 and administered a full battery of

neurological tests, including an electroencephalogram (EEG) and computed tomography imaging

(CT scan) of Gomez' brain.[322]  Cuetter filed a written report with the trial court in which he

stated that Gomez' EEG and CT scan were in all respects virtually normal.[323]  He concluded that

there was no evidence that Gomez was suffering from any neurological disease or defect.[324]

The state habeas court found that, during the guilt-innocence stage of Gomez' trial, trial

counsel elicited testimony before the jury from both Dr. Cuetter and Dr. Fernandez that Gomez

was of borderline intelligence.[325]  It also found that trial counsel's strategy at the punishment

phase was to present evidence of Gomez' "personal history," "what [he had] done throughout his

---

[319]See id., p. 11 ¶ 58.

[320]See id., p. 11 ¶ 57.

[321]See id., p. 11 ¶ 59.

[322]See id., pp. 11-2 ¶ 60.

[323]See id.

[324]See id.

[325]See id., p. 12 ¶ 61. The state habeas court also found that the State filed a pretrial motion requesting that Gomez be examined the State's psychiatric expert, Dr. Richard Coons, but that the request was denied and Gomez was never examined by the State's expert.  See id., p. 12 ¶ 62.  It further found that before the punishment phase began, the State objected to the defense presenting any expert testimony regarding Gomez' future dangerousness, because the State was not permitted an opportunity to have its own expert evaluate him.  See id., p. 12 ¶ 63.

life, his goals, his ambitions," and his relationships with his family and community.[326]  Counsel

called eight witnesses, including Gomez' wife, brother-in-law, neighbors, and a priest to testify

that Gomez was a good person who never got angry and who was a "responsible" person.[327]

Counsel first urged the jurors to see Gomez as a good and decent human being, emphasizing the

mitigating circumstances as testified to by the defense witnesses.[328]  He then asked the jury for

mercy.[329]

   State habeas counsel presented the state habeas court with the written report of Francisco

Perez, Ph.D.  Dr. Perez, a neuropsychologist, examined Gomez approximately 19 months after

his trial.[330]  He stated in his report that Gomez was suffering from "neuropsychological deficits"

that would have significantly influenced his behavior at the time of the offense and that he was

suffering from those same deficits before his trial.[331]  The state habeas court found that Dr.

Cuetter, before Gomez' trial, performed more comprehensive neurologic tests, including an EEG

and CT scan, than did Dr. Perez.[332]

   It specifically found that trial counsel conducted a very thorough investigation into

---

[326]See id., p. 12 ¶ 64.

[327]See id., p. 12 ¶ 65.

[328]See id., p. 13 ¶ 66.

[329]See id.

[330]See id., p. 13 ¶ 67.

[331]See id.

[332]See id., p. 13 ¶ 68.

possible brain injury that might have affected Gomez' conduct at the time of the offense.[333]
Moreover, the state habeas court found that, despite trial counsel's thorough investigation into
possible brain damage, all of the evidence available to him before trial indicated that Gomez was
not suffering from any neurologic defect or injury.[334]  Because none of the medical evidence
available to trial counsel at the time of trial, from four separate experts who examined Gomez at
trial counsel's request, suggested that Gomez suffered from any neurological injury or defect, the
state habeas court also found that trial counsel's strategy at the punishment phase (*i.e.*, presenting
evidence that Gomez was a responsible family man who was well-respected in his community)
was reasonable trial strategy.[335]

Based on these factual findings, the state habeas court concluded that Gomez had failed to
plead any facts showing that trial counsel's investigation into this issue was in any way deficient
or that his failure to pursue further investigation was not the product of reasonable professional
judgment.[336]  Moreover, it concluded that Gomez had failed to plead any facts sufficient to
overcome the presumption, which was supported by the record, that counsel's decision to forego
presentation of evidence of alleged neurologic injuries in lieu of attempting to show that Gomez
was a decent, responsible, and well-respected person, was a reasonable and sound trial
strategy.[337]  Accordingly, it further concluded that Gomez had failed to meet his burden to plead

---

[333]*See id.*, p. 13 ¶¶ 69-70.

[334]*See id.*, p. 13 ¶ 70.

[335]*See id.*, p. 14 ¶ 71.

[336]*See id.*, p. 23 ¶ 24.

[337]*See id.*, p. 23 ¶¶ 25-26.

facts showing that he was denied effective assistance of counsel regarding trial counsel's

investigation into and presentation of evidence concerning Gomez' alleged neurologic defects.[338]

2.      *Legal standard – Ineffective assistance of counsel due to failure to investigate potential mitigating evidence*

Counsel has a duty to make reasonable investigations or to make a reasonable decision

that makes particular investigations unnecessary.[339]  In evaluating any ineffective assistance claim

arising from a particular decision not to investigate, a reviewing court must directly assess that

decision for its reasonableness in light of all the circumstances, while affording a heavy measure

of deference to counsel's judgment.[340]  In the present context, the principal concern in deciding

whether counsel exercised reasonable professional judgment is not whether he should have

presented a mitigation case.[341]  Rather, the proper inquiry is whether the investigation supporting

counsel's decision not to introduce mitigating evidence of the petitioner's neurological

functioning was itself reasonable.[342]  In assessing the reasonableness of counsel's investigation,

the reviewing court must objectively review counsel's performance, measuring it for

reasonableness under prevailing professional norms, including the context-dependent

consideration of the challenged conduct as seen from counsel's perspective at the time.[343]  It must

---

[338]*See id.*, p. 24 ¶ 27.

[339]*See Wiggins v. Smith*, 539 U.S. 510, *21-22, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471, 485 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)).

[340]*See id.*

[341]*See id.* at 2536.

[342]*See id.*

[343]*See id.*

consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.[344] With these principles in mind, the Court now turns to the merits of Gomez' instant ineffective assistance claim.

*3. Discussion*

Gomez describes the state habeas court's legal conclusions (*i.e.*, that Gomez had failed to plead any facts showing that his trial counsel's investigation into possible neurological deficits was in any way deficient or that the decision not to investigate further was not the result of reasonable professional judgment) as "patently inaccurate and therefore unreasonable."[345] "Even a cursory examination of the post-conviction habeas pleadings in state court," he argues, "reveals unmistakably that Gomez faulted his trial lawyers both for the deficiency of their investigation into his brain injuries and for their failure to pursue further investigation without any plausible strategic or tactical reason."[346] Moreover, Gomez argues, he was prepared to prove these allegations by calling either or both of his trial attorneys to testify at an evidentiary hearing before the convicting court, but even though he expressly requested an evidentiary hearing, his request was denied.[347] Thus, to the extent that the state habeas court rejected his ineffective assistance claim because he failed to plead sufficient grounds for relief or because he failed to develop the factual basis for his claim in state court, he argues that he was prevented from

---

[344]*See id.* at 2538.

[345]*See* Pet'r. Br., p. 53.

[346]*Id.*

[347]*See id.*

producing the necessary testimony in the state convicting court through no fault of his own, and should now be afforded an opportunity to do so.[348]

The Court has examined the record below and finds that it does not support Gomez' assertions to any degree whatsoever. State habeas counsel (who also represents Gomez in the instant federal habeas proceeding) filed Gomez' state application for a writ of habeas corpus on August 23, 2000.[349]  As exhibits, counsel attached a copy of the judgment and sentence in Gomez' trial; his notice of appeal; and a Neuropsychological & Psychological Evaluation of Gomez prepared by Francisco Perez.[350]  He did not come forward, however, with an affidavit from trial counsel stating why he did not pursue the investigation into Gomez' potential neurological deficits further, in an attempt to show that some factual basis existed to support his ineffective assistance claim.[351]  Nor did he attempt to show that trial counsel refused to cooperate with state habeas counsel.[352]  The prayer for relief included nothing more than a generalized request for the trial court to hold an evidentiary hearing.[353]

---

[348]*See id.*

[349]*See id.*, pp. 53-4.

[350]*See Ex parte Gomez*, No. 52,166-01 (Tex. Crim. App. June 5, 2002), State Application for Writ of Habeas Corpus.

[351]*See id.*

[352]*See id.*

[353]*See id.*, p. 96.

On March 16, 2001, counsel filed a Motion for Evidentiary Hearing.[354]  Therein, he requested an evidentiary hearing to develop the factual basis for only two of his claims – that qualified venire members were unconstitutionally excluded from jury service based on their opposition to capital punishment and that counsel was ineffective for failing to prevent this unconstitutional exclusion.[355]  Defendant's Motion for an Evidentiary Hearing did not specifically request a hearing in connection with his instant ineffective assistance claim, nor did he attach exhibits or affidavits of any kind.[356]  The state habeas court declined to hold an evidentiary hearing, implicitly finding that all previously unresolved factual issues material to Gomez' confinement could be determined from the parties' pleadings, exhibits, and the record on direct appeal.[357]

As discussed at length earlier in this Opinion, the state habeas court's factual findings are presumed to be correct in the absence of any clear and convincing evidence to the contrary. Gomez has come forward with no evidence, such as the affidavits from trial counsel or an affidavit asserting that trial counsel refused to cooperate with federal habeas counsel, to overcome this presumption.  Accordingly, this Court must accept as true the state habeas court's determinations, including that counsel: (1) initiated neurological and psychological evaluations of his client by experts in these fields; (2) upon learning that his client may have suffered a

---

[354]*See Ex parte Gomez*, No. 52,166-01 (Tex. Crim. App. June 5, 2002), Motion for Evidentiary Hearing.

[355]*See id.*  These two claims correspond to Claims One and Two of his instant federal habeas petition.

[356]*See id.*

[357]*See* Findings of Fact or Concl. of Law, p. 1

significant head injury, requested further examination to investigate the possibility of permanent

brain damage, which may have affected his behavior during the offense and mitigated his

culpability; (3) received four independent reports in which the authors concluded that his client

possessed only a low degree of intelligence, but was nonetheless mentally competent to stand

trial and did not show signs of abnormal brain activity; (4) thereafter, during the guilt-innocence

phase, counsel emphasized the evidence of his client's low intelligence; and (5) at the

punishment phase, emphasized that his client was a responsible family man, well-respected by

many members of his community.

The state habeas court concluded from these facts, as well as Gomez' failure to allege any

countervailing facts demonstrating that counsel's investigation was deficient and not the product

of reasonable professional judgment, that he had failed to satisfy the first prong of the *Strickland*

test for ineffective assistance of counsel.  Given the evidence before it, the Court cannot conclude

that the state habeas court's rejection of Gomez' ineffective assistance claim was contrary to, or

an unreasonable application of, clearly established federal law concerning ineffective assistance,

nor that the state habeas court's determination of the facts was unreasonable in light of the

evidence before it.  **Accordingly, this Court concludes that Gomez' fourth claim lacks merit**

**under the AEDPA.**

      E.      **Claims Five, Six, and Seven: The trial court violated Gomez' Fourteenth**
                   **Amendment right to due process, his Eighth Amendment right to be free**
                   **from cruel and unusual punishment, and his Sixth Amendment right to**
                   **compulsory process when it refused to inform the jury that, if not sentenced**
                   **to death, Gomez would be required to serve a minimum of 40 years in prison**
                   **before becoming eligible for parole.**

Gomez argues that the trial court's refusal to instruct the jury about his parole eligibility if he were not sentenced to death violated his constitutional rights in the following regard.   First, he contends that he has a right under the Eighth Amendment to offer evidence in mitigation of the death penalty, including evidence which tends to suggest that he would not be dangerous in the future if allowed to live.[358]   Moreover, he argues, he has a due process right under the Fourteenth Amendment to rebut evidence tending to suggest that he would pose a future danger if allowed to live, because no person may be sentenced to death on the basis of information that he did not have an opportunity to deny or explain.[359]   Further, he contends that he has an additional due process right as well as a right under the Sixth Amendment to be afforded a meaningful opportunity to present a complete defense, including the right to put before the jury evidence that might influence the determination of guilt.[360]

### 1. Legal standard – Jury instructions of parole eligibility

States are generally free to formulate the type of jury instructions given in state trials.[361] The Supreme Court, however, has carved a narrow due process-based exception to the presumption that states enjoy wide discretion in the realm of jury instructions.[362]   "[W]here a

---

[358]See Pet'r. Br., pp. 57-61.

[359]See id., pp. 61-5.

[360]See id., pp. 65-8.

[361]See California v. Ramos, 463 U.S. 992, 1000, 103 S. Ct. 3446, 3452-3, 77 L. Ed. 2d 1171 (1983) (federal courts owe enhanced deference to state legislative decisions concerning determination of punishment, because these are peculiarly questions of legislative policy); see also Tigner v. Cockrell, 264 F.3d 521 (5th Cir. 2001), cert. denied 534 U.S. 1164 (2002) (states are generally free to formulate the type of jury instructions given in state trials).

[362]See Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994); Tigner, 264 F.3d at 524-5.

capital defendant's future dangerousness is at issue, and the only sentencing alternative to death

available to the jury is life imprisonment without possibility of parole, due process entitles the

defendant 'to inform the jury of [his] parole ineligibility, either by jury instructions or in

arguments by counsel.'"[363] A state must give a jury instruction regarding parole ineligibility (a

*Simmons* instruction) if: (1) the state introduces the defendant's future dangerousness in asking

for the death penalty, and (2) the alternative sentence to death is life without the possibility of

parole.[364] "The parole eligibility instruction is required only when, assuming the jury fixes the

sentence at life, the defendant is ineligible for parole under state law."[365]

   "[The Fifth Circuit] has consistently emphasized that a defendant can receive a jury

instruction regarding parole ineligibility only if there exists a life-without-possibility-of-parole

alternative to the death penalty – an option not available under Texas law."[366] It has expressly

rejected arguments urging it to rule that Texas capital defendants are entitled to a *Simmons*

instruction, determining that such arguments are barred by the *Teague* non-retroactivity

principle.[367] It has also rejected the argument that a Texas court's failure to give a *Simmons*

---

[363]*Shafer v. South Carolina*, 532 U.S. 36, 39, 121 S. Ct. 1263, 149 L. Ed. 2d 178 (2001) (quoting *Simmons*, 512 U.S. 154).

[364]*See Tigner*, 264 F.3d at 525.

[365]*Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S. Ct. 2113, 2120, 147 L. Ed. 2d 125 (2000)

[366]*Tigner*, 264 F.3d at 524; *see Medellin v. Dretke*, 371 F.3d. 270, 276 (5th Cir. 2004) (a Texas trial court need not instruct the jury regarding a capital murder defendant's eligibility for parole); *Wheat v. Johnson*, 238 F.3d 357 (5th Cir. 2001), *cert. denied*, 532 U.S. 1070 (2001) (holding that defendant was not entitled to a *Simmons* instruction because he faced an alternative sentence with the possibility of parole 40 years later).

[367]*See Tigner*, 264 F.3d at 525 (stating that the Fifth Circuit has repeatedly held that such an extension of *Simmons* would constitute a new rule of constitutional criminal law under *Teague*); *see Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L, Ed. 2d 334 (1989) (holding that new rules of constitutional criminal law will not be announced or applied on collateral review).

instruction violates the Eighth Amendment's prohibition against cruel and unusual punishment.[368]  The Circuit, however, has yet to address Gomez' Sixth Amendment permutation regarding the *Simmons* instruction in a published opinion.

*2. Discussion*

Gomez' claims that the trial court violated his Eighth and Fourteenth Amendment rights are squarely foreclosed by Fifth Circuit precedent and *Teague* non-retroactivity principles.[369] After due consideration and for the reasons discussed below, the Court also concludes that Gomez has failed to show a Sixth Amendment violation, and that in any event, such a claim would be similarly barred by *Teague*.

Gomez argues that "when a capital defendant is foreclosed from offering evidence of fixed-term parole ineligibility, he is effectively prevented from putting relevant evidence before the fact finder on a material sentencing issue even though the rule excluding such evidence does not further any legitimate interest of the state."[370]  The Supreme Court explained in *United States v. Scheffer* that

> a defendant's right to present relevant evidence is not unlimited, but rather is
> subject to reasonable restrictions.  A defendant's interest in presenting such
> evidence may thus bow to accommodate other legitimate interests in the criminal
> trial process.  As a result, state and federal rulemakers have broad latitude under
> the Constitution to establish rules excluding evidence from criminal trials.  Such
> rules do not abridge an accused's right to present a defense so long as they are not

---

[368]*See Tigner*, 264 F.3d at 525 (stating that the Fifth Circuit has held that neither the due process clause nor the Eighth Amendment requires a state court to give jury instructions regarding parole eligibility in Texas); *Johnson v. Scott*, 68 F. 3d 106, 112 (5th Cir. 1995) (neither the due process clause nor the Eighth Amendment compels instructions on parole in Texas).

[369]*See Tigner*, 264 F.3d at 525.

[370]Pet'r Br. at 72.

> arbitrary or disproportionate to the purposes they are designed to serve. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. [371]

This Court concludes that Gomez has failed to show that he was prevented from offering such evidence during the punishment phase of the trial.  The fact that the jury charge did not include information about the parole implications of a life sentence does not indicate that such evidence could not have been adduced at trial. Gomez himself concedes that he never sought to introduce testimony that, if sentenced to life imprisonment, he would almost certainly never be released on parole.  Thus, the Court concludes that Gomez has failed to establish a factual basis for a Sixth Amendment claim.

To the extent  he argues that this Court should recognize a novel legal claim (*i.e.*, that a capital defendant in a state that does not offer life without parole as the only alternative to a death sentence is entitled under the Sixth Amendment to a jury instruction on parole eligibility), such a claim would in any event be barred by *Teague*.  This Court therefore concludes that the state habeas court's rejection of Gomez' Sixth Amendment claim did not result in a decision contrary to clearly established law. **Accordingly, this Court concludes that Gomez' fifth, sixth, and seventh claims lack merit under the AEDPA.**

## V.     CERTIFICATE OF APPEALABILITY

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a

---

[371]*Scheffer*, 523 U.S. 303, 308 (1998) (internal citations and quotations omitted).

Certificate of Appealability ("CoA").[372]   The CoA requirement supersedes the previous

requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed

after the effective date of the AEDPA.[373]   Under the AEDPA, before a petitioner may appeal the

denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.[374]

Under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA

is granted.[375]   In other words, a CoA is granted or denied on an issue-by-issue basis, thereby

limiting appellate review to those issues on which CoA is granted alone.[376]

A CoA will not be granted unless the petitioner makes a substantial showing of the denial

of a constitutional right.[377]   To make such a showing, the petitioner need not show that he will

prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for

---

[372]*See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997) (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997) (holding that the standard for obtaining a CoA is the same as for a CPC).

[373]*See Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

[374]*See Miller-El v. Johnson*, 537 U.S. 322, 335-6, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931, 949 (2003); 28 U.S.C.A. §2253(c)(2) (West Supp. 2003).

[375]*See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that the scope of appellate review of denial of habeas petition is limited to issue on which CoA granted).

[376]*See Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C.A. §2253(c)(3) (West Supp. 2003).

[377]*See Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S. Ct. 1595, 1603 (2000); and *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 3394, 77 L. Ed. 2d 1090, 1104 (1983).

that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further.[378] This Court is authorized to address the propriety of granting a CoA *sua sponte*.[379]

The showing necessary to obtain a CoA on a particular claim depends upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the Court's assessment of the constitutional claim to be debatable or wrong.[380] In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling.[381]

---

[378]*See Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604; and *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S. Ct. at 3394 n.4.

[379]*Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

[380]     "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."
*Miller-El v. Johnson*, 537 U.S. at 338, 123 S. Ct. at 1040 (quoting *Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604).

[381]*Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding that when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether: (1) the claim is a valid assertion of the denial of a constitutional right; and (2) the district court's procedural ruling was correct).

The determination of whether an unsuccessful federal habeas corpus petitioner is entitled to a Certificate of Appealability must be viewed through the prism of the AEDPA's highly deferential standard of review. Thus, the issue before this Court when determining whether the petitioner is entitled to a CoA is not whether reasonable jurists could disagree with this Court's resolution of the merits of petitioner's claims for relief but, rather, whether reasonable jurists could disagree with this Court's determination that the state habeas court acted reasonably when that court denied petitioner's claims on the merits.

Viewed in proper context, there is no basis for disagreement among jurists of reason regarding the Court's disposition of Gomez' claims herein under the AEDPA. With respect to Gomez' claims, which this Court previously dismissed with prejudice on procedural grounds, it is clear from the record that, as with his incompetency claim, the issues are not yet ripe for adjudication, or that he has failed to preserve his claims for review or to fairly present them in state court proceedings.

Moreover, there is no basis for disagreement regarding this Court's disposition of Gomez' claims on the merits. Regarding his first and second claims, both of which are based on his contention that otherwise qualified venire members were unconstitutionally excluded from jury service, Gomez has entirely failed to show that the state courts rendered a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. He has similarly failed to show that the state court decision was based on an unreasonable determination of the facts in light of the evidence before it.

Gomez has likewise failed to show that he is entitled to relief regarding his ineffective assistance of counsel claims. His claims in this respect are clearly refuted by even casual

reference to the record before the state habeas court. Likewise, there is no basis for disagreement among jurists of reason regarding this Court's disposition of Gomez' claim that the trial court refused to instruct the jury, permit him to introduce evidence, or make arguments concerning his parole eligibility. The Fifth Circuit has repeatedly held that such claims do not warrant a CoA.[382]

## VI.   CONCLUSION

Under such circumstances, the Court concludes that petitioner is not entitled to a Certificate of Appealability with regard to any of his claims for relief raised herein.

Accordingly, it is hereby **ORDERED** that:

1.      Petitioner Ignacio Gomez' third claim, that he is incompetent to be executed, is **DISMISSED WITHOUT PREJUDICE** as unripe for adjudication.

2.      All other relief requested in Petitioner Ignacio Gomez' petition for federal habeas corpus relief, filed May 30, 2003,[383] is **DENIED**.

3.      Petitioner is **DENIED** a Certificate of Appealability.

4.      All other pending motions are **DISMISSED AS MOOT**.

---

[382]*See Smith v. Cockrell*, 311 F. 3d 661, 684 (5th Cir. 2002); *Woods v. Cockrell*, 307 F.3d 353, 361-62 (5th Cir. 2002); *Johnson v. Cockrell*, 306 F.3d 249, 256-57 (5th Cir. 2002); *Collier v. Cockrell*, 300 F.3d 577, 583-86 (5th Cir. 2002); *Rudd v. Johnson*, 256 F.3d 317, 320-21 (5th Cir. 2001); *Wheat v. Johnson*, 238 F.3d 357, 361-63 (5th Cir. 2001).

[383]*See* docket entry no. 15.

5.      The Clerk shall prepare and enter a Judgment in conformity with this

Memorandum Opinion and Order.

   **SIGNED and ENTERED this** _30 th_ **day of September, 2004, at El Paso, Texas.**

                                                         **PHILIP R. MARTINEZ**
                                                         **UNITED STATES DISTRICT JUDGE**