# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# FILED

May 27, 2008

No. 04-70047

Charles R. Fulbruge III
Clerk

IGNACIO GOMEZ,

Petitioner-Appellant,

v.

NATHANIEL QUARTERMAN,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

---

Appeal from the United States District Court
for the Western District of Texas

---

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge.

Ignacio Gomez, a Mexican citizen, confessed that he shot and killed three teenagers in Texas. He was convicted of capital murder and sentenced to death. After the Texas Court of Criminal Appeals ("CCA") affirmed and denied his state application for writ of habeas corpus, he petitioned for federal habeas relief. The district court denied his petition, and he applied to this court for a certificate of appealability ("COA") on the ground, *inter alia*, that he was unconstitutionally

No. 04-70047

deprived of his rights under the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77 (the "Vienna Convention"), as recognized by a decision of the International Court of Justice ("ICJ").

We granted Gomez's motion to stay consideration of his COA application pending exhaustion of remedies in state court. In *Ex parte Cardenas*, 2007 WL 678628, at *1 (Tex. Crim. App. Mar. 7, 2007) (per curiam), the court dismissed Gomez's second state habeas petition, citing *Ex parte Medellin*, 223 S.W.3d 315 (Tex. Crim. App. 2006). The Supreme Court affirmed the CCA's decision in *Medellin*, holding that although the ICJ's decision regarding the Vienna Convention created an international obligation, it is without direct domestic effect. *Medellin v. Texas*, 128 S. Ct. 1346 (2008).

That new Supreme Court decision, in conjunction with *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006)—which held that the Vienna Convention does not require that evidence obtained in violation of the Convention be suppressed —is fatal to Gomez's argument that a COA should be granted. Because no "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (internal citations and quotations omitted), as to Gomez's Vienna Convention claim or his other arguments, we deny a COA.

## I.

Gomez, a lawful United States resident alien and citizen of Mexico, lived outside El Paso with members of his extended family. In November 1996, John Greer hosted a bonfire at his home, about one block away from the Gomez property. Greer was at the party with his son Jessie and some of Jessie's teenage friends, including Matthew and Michael Meredity, who were 16-year-old twins, and Toby Hathaway, an 18-year-old.

For reasons that are not obvious, one of Gomez's brothers, Roberto, and

No. 04-70047

Gomez's brother-in-law, Joel Guillen, engaged in a minor scuffle with a guest at the party. Later that evening, someone broke a couple of windows at Gomez's mother's home. The next day, according to his confession, Gomez's mother told Gomez about the vandalism and how it frightened her, and he became upset. He wrapped a loaded .357 handgun in a white t-shirt, hid it in his Chevy Blazer, and began scouring the neighborhood—"cruising around," in his words—for the vandals. Gomez came across Roberto, Guillen, and another of Gomez's brothers, Jose Luis, all of whom joined Gomez in the Blazer.

According to Guillen's testimony at trial, the Meredith twins and Hathaway were walking along a dirt road. Roberto saw and identified them as "the guys that broke the windows." The vehicle stopped. Jose Luis, Roberto, and Guillen each attacked one of the teenagers. No weapons were used in the fighting, and Gomez at first just watched but, about a minute later, started shooting, hitting one of the teenagers in the head. He continued to fire, hitting another; the third ran.

Gomez returned to the Blazer and reloaded. He ordered Guillen to capture the escaping teenager, but Guillen refused. Jose Luis did not, and he forced the last victim back to Gomez, who proceeded to execute him. In all, about a dozen shots were fired. Guillen and Roberto, frightened, ran away. When they returned, they saw Gomez and Jose Luis loading the bodies into the back of the Blazer, with Gomez still holding the gun. He ordered Guillen and Roberto to help load the bodies.

Guillen also testified that Gomez and his cohorts drove into the desert and dropped the bodies onto the ground. Gomez thought one of the victims was still alive and proceeded to kick him six times in the face. Gomez stripped his victims, went home, and burned their clothes. He concealed the .357 in a chicken coop and took shovels back into the desert, where he, Jose Luis, and Guillen dug a shallow grave, buried the bodies, and covered the area with a bush.

3

No. 04-70047

When the teenagers did not come home by curfew, their mothers became worried and tried to find them. Eventually Michael's baseball cap was spotted next to two live rounds and some blood. The family called the police. While officers were at the scene, Roberto and Guillen arrived at the police station, confessed all the information they had, and showed where the bodies were buried.

## II.

### A.

Gomez was arrested and given a *Miranda* warning, his vehicle was impounded, and he was taken to the police station, where he was given another *Miranda* warning. He then confessed,[1] and told where the murder weapon was hidden. He also consented to a search of his house and vehicle.

Gomez acknowledged that he was "upset" about what had happened to his mother and that when he was close—"about six feet"—from the person that Roberto said had broken the windows, he "discharged one round from [his] .357 cal. handgun[,] hitting him in the forehead." He confessed to shooting the other two teenagers and said that, after they were down, he "continued discharging the rest of the rounds at the three bodies," then "reloaded [his] gun with six more rounds and fired them at the three bodies." He recounted how, after the initial gunshots, he made "the last guy [he] killed" "sit next to his friends [i.e., the victims], at which time [he] shot him [i]n the head," then "shot him some more." He said he "just went out of control over [his] mother's broken windows and her just getting scared."

The autopsy indicated that Toby was shot four times, including one bullet to the head. Michael was shot once, also in the head. Matthew was shot six times, including a close-range shot to the forehead, with another discharge to his

---

[1] Gomez denied the validity of the confession, saying that he was induced to sign something that he did not understand. Contrary evidence, however, was presented.

4

face.  At trial, various experts testified to evidence that corroborated Gomez's confession, such as whether the .357 found on his property could fire .38 caliber ammunition, which he said he had used, and whether Gomez's .357 was the weapon that killed two of the victims.  The evidence was inconclusive as to whether the gun fired the lone bullet that killed Michael.

At sentencing, the government presented evidence that Gomez was a dangerous law breaker, that he had physically resisted arrest in the past, that he had been convicted three times for driving while intoxicated, that he had been arrested for unlawfully carrying a weapon, and that he had once tried to run someone down with a truck.  Gomez offered some mitigating evidence involving his mettle as a father and his participation in community projects.  The state argued that the brutality of the slayings justified the death penalty and that even Gomez's witnesses showed that he was dangerous.  Gomez was sentenced to death in June 1998.

Before trial, Gomez filed a motion to suppress his confession and the fruits of the search of his home on the ground that he had not been advised of his rights under the Vienna Convention.  Specifically, he argued that the police should have told him of his right to the assistance of a Mexican consul.  Evidence was presented that the officer who took his confession knew that Gomez was a resident alien but did not advise him of his Vienna Convention rights, allegedly because he believed the rights do not apply to resident aliens.  The trial court denied the motion.

B.

Gomez's capital murder conviction was automatically appealed to the CCA, where Gomez argued that the failure to suppress violated both Texas law and the Supremacy Clause of the United States Constitution.  The CCA affirmed in September 2000.  *Gomez v. State*, No. 73,199 (Tex. Crim. App. Sept. 20, 2000).

5

No. 04-70047

Gomez filed a state habeas petition that the CCA denied in June 2002. In federal court, he petitioned for habeas relief, arguing, *inter alia*, that his constitutional rights had been violated because of the denial of his Vienna Convention privileges. The district court ruled in late September 2004 that Gomez's Vienna Convention claims were unexhausted, because his briefing to the state court was perfunctory and because he did not reargue his claim to the state court on a motion for rehearing.

Gomez applied to this court for a COA, arguing both that his claim was exhausted and that, in any event, there was no "independent and adequate" state ground, *Lee v. Kemna*, 534 U.S. 362, 375 (2002), precluding the federal courts from considering his argument, because Vienna Convention claims like his present an "exceptional case[] in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.* at 376.

Before we ruled on the COA application, Gomez moved this court to stay consideration of his COA application so that he could pursue his claim further in state court. We granted the motion in August 2005. In March 2007, the CCA, in *Cardenas*, denied Gomez's petition. In June 2007, we advised the attorneys that we were putting this appeal on hold pending a decision by the Supreme Court in *Medellin*.


III.

Under the Antiterrorism and Effective Death Penalty Act of 1996, a petitioner must secure a COA to appeal the federal district court's denial of habeas relief, and a COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To apply this standard, we conduct a "threshold inquiry" and must issue a COA if "reasonable jurists would find the district court's assessment of the constitutional

6

claims debatable or wrong." *Miller-El*, 537 U.S. at 336-38 (internal citations and quotations omitted). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Nevertheless, "issuance of a COA must not be *pro forma* or a matter of course," and "a prisoner seeking a COA must prove 'something more than the absence of frivolity.'" *Id.* at 337-38 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner. *See Lamb v. Johnson*, 179 F.3d 352, 356 (5th Cir. 1999).

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law *de novo*, applying the same standard of review to the state court's decision as the district court." *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). We do "not grant relief on any claim adjudicated on the merits by a state court unless the state decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or if the state court's determination of facts was unreasonable in light of the evidence." *Id.* (citing 28 U.S.C. § 2254(d)). A state court decision is "contrary to . . . established federal law," where it "applies a rule that contradicts governing law set forth in [Supreme Court precedent]" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from . . . precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Moreover, "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'" *Id.* at 407-08.

No. 04-70047

## IV.

The Vienna Convention, drafted in 1963, was ratified by the United States in 1969. *Sanchez-Llamas*, 126 S. Ct. at 2674-75. "Article 36 of the Convention concerns consular officers' access to their nationals detained by authorities in a foreign country," requiring "that 'if [the detained national] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.'" *Id.* at 2675 (quoting Vienna Convention, Art. 36(1)(b)). "Article 36(1)(b) . . . states that '[t]he said authorities shall inform the person concerned [i.e., the detainee] without delay of his rights under this sub-paragraph.'" *Id.* (quoting Vienna Convention, Art. 36(1)(b)).

The United States also ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 325 ("Optional Protocol"), which places the resolution of disputes arising out of the Vienna Convention within the ICJ's compulsory jurisdiction. *Id.*[2] In 2004, the ICJ ruled that, "based on violations of the Vienna Convention, 51 named Mexican nationals were entitled to review and reconsideration of their state-court convictions and sentences in the United States." *Medellin*, 128 S. Ct. at 1355 (citing *Case Concerning Avena & Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 12 (Judgment of Mar. 31, 2004) ("*Avena*")). The ICJ's decision purported to apply regardless of any procedural-defaults; Gomez was one of those listed Mexican nationals.

Also in 2004, after *Avena* was decided, we denied a COA in *Medellin v. Dretke*, 371 F.3d 270, 279-80 (5th Cir. 2004), holding that notwithstanding the

---

[2] Though it is irrelevant to this case, which concerns alleged violations of Gomez's rights under the Vienna Convention in the 1990's, as of March 7, 2005, the United States has withdrawn from the Optional Protocol. *Sanchez-Llamas*, 126 S. Ct. at 2675.

No. 04-70047

ICJ's decision, the doctrine of procedural default applied and that, in any event, "Article 36 of the Vienna Convention does not create an individually enforceable right." The Supreme Court granted *certiorari*. *Medellin v. Dretke*, 543 U.S. 1032 (2004) The President, however, then decided, in a Memorandum to the Attorney General ("President's Memorandum"), that the nation would comply with *Avena*. Relying on *Avena* and the memorandum, the petitioner in *Medellin* again filed a state petition. The Court dismissed the writ as improvidently granted. *Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (per curiam).

Before the CCA could rule again in *Medellin*, however, the Court in 2006 decided *Sanchez-Llamas*, a case raising issues similar to those in *Medellin*. In *Sanchez-Llamas*, the questions were whether the Vienna Convention requires the suppression of evidence and whether alleged violations of the Vienna Convention are subject to procedural default. The petitioners in *Sanchez-Llamas* were not named in the *Avena* ruling, but *Sanchez-Llamas* was decided after the ICJ's decision.

Chief Justice Roberts, for the *Sanchez-Llamas* Court, 126 S. Ct. at 2674, wrote that, "even assuming the [Vienna] Convention creates judicially enforceable rights, [the] suppression [of evidence] is not an appropriate remedy for a violation of Article 36 . . . ." The Court noted that "[t]he exclusionary rule as we know it is an entirely American legal creation" and is not accepted elsewhere, so "[i]t is implausible that other signatories to the Convention thought it to require a remedy that nearly all refuse to recognize as a matter of domestic law." *Id*. at 2678. "Under our domestic law, the exclusionary rule is not a remedy we apply lightly," *id*. at 2680, and it does not apply to violations of the Vienna Convention, because, *inter alia*, "[t]he violation of the right to consular notification . . . is at best remotely connected to the gathering of evidence," *id*. at 2681; "Article 36 does not guarantee defendants *any* assistance at all [from their consulates]," *id*.; and "[t]he failure to inform a defendant of his Article 36 rights is unlikely, with

No. 04-70047

any frequency, to produce unreliable confessions," *id*. Consequently, the "[s]uppression would be a vastly disproportionate remedy for an Article 36 violation." *Id*.

The *Sanchez-Llamas* Court, following *Breard v. Greene*, 523 U.S. 371 (1998), also held that procedural-default rules apply to violations of Article 36. The Court acknowledged the contrary result reached by the ICJ on the same question but decided that though "'respectful consideration'" should be given to the "ICJ's interpretation," "it does not compel [United States courts] to reconsider our understanding of the [Vienna] Convention in *Breard*." *Sanchez-Llamas*, 126 S. Ct. at 2683 (quoting *Breard*, 523 U.S. at 375).[3] Moreover, the Court recognized that the ICJ's role "is to arbitrate particular disputes between national governments," and its decisions are "quintessentially *international*" in character. *Id*. at 2684-85.

Later in 2006, the CCA again ruled in *Medellin*, 223 S.W.3d at 352, holding that the second petition constituted an abuse of the writ, that *Avena* was not binding in domestic courts, and that the President's Memorandum, when construed as an executive order and not a mere friendly suggestion, violated separation of powers principles. *Certiorari* was again granted. *Medellin v. Texas*, 127 S. Ct. 2129 (2007).

The *Medellin* Court, with Chief Justice Roberts once more wielding the pen, recognized that "the *Avena* decision . . . constitutes an *international* law obligation on the part of the United States" but that "not all international law obligations automatically constitute binding federal law enforceable in United States courts." *Medellin*, 128 S. Ct. at 1356. The Court then held that the Optional Protocol, United Nations Charter, and ICJ Statute do not "create[] binding

---

[3] The Court also observed that ICJ decisions have no precedential force "*even as to the ICJ itself*." *Id*. at 2684 (citing Statute of the International Court of Justice, Art. 59, 59 Stat. 1062 (1945)).

No. 04-70047

federal law in the absence of implementing legislation" and that "because it is uncontested that no such legislation exists," "the *Avena* judgment is not automatically binding domestic law." *Id.* at 1357.  These agreements are not self-executing, and thus decisions as to how—or whether—ICJ judgments will be enforced lie with the political branches.[4]

The *Medellin* Court then addressed what effect should be given to the President's Memorandum, which was an attempt by the executive branch to comply with *Avena*.  The Court held that "[t]he President has an array of political and diplomatic means available to enforce international obligations, but unilaterally converting a non-self-executing treaty into a self-executing one is not among them." *Id.* at 1368.  Instead, the power to satisfy international obligations stemming from non-self-executing treaties by means of domestic law belongs to Congress "in the same way as [with] any other law . . . ." *Id.* at 1369.

## V.

With this Supreme Court guidance in mind, we deny a COA in regard to the asserted violations of the Vienna Convention.[5]  No reasonable jurist could conclude, in light of the explicit pronouncements in *Medellin* and *Sanchez-Lla-*

---

[4] Treaties, under the Supremacy Clause, are "the supreme Law of the land" such that "the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.  At first blush, it may seem strange, given the explicitness of this constitutional language, that there are treaties that do not bind courts.  The explanation is that such treaties are without domestic effect because they do not obligate the United States to give them domestic effect.  Thus, when ratified, they do become part of "the supreme Law of the land," and they are respected according to their terms, but those terms do not require automatic judicial enforcement. *See Medellin*, 128 S. Ct. at 1369 ("A non-self-executing treaty, by definition, is one that was ratified with the understanding that it is not to have domestic effect of its own force.").

[5] Because these recent Court decisions have answered Gomez's substantive legal question, we need not address whether this issue was adequately exhausted in state court.  Even assuming that it was exhausted properly, the argument lacks merit, so, pursuant to 28 U.S.C. § 2253, we decline to issue a COA.

No. 04-70047

*mas*, that Gomez's constitutional rights were violated when the Texas court refused to suppress his confession. *Sanchez-Llamas* establishes the general proposition that violations of the Vienna Convention do not require the suppression of evidence, and *Medellin* reinforces *Sanchez-Llamas* by holding that the general proposition applies even in the face of a contrary ICJ decision and presidential order.

These precedents apply with full force to Gomez. As in *Sanchez-Llamas*, he argues that his confession should have been suppressed, notwithstanding appropriately-given *Miranda* warnings, because he confessed without first being informed of his rights under Article 36 of the Vienna Convention. The law is straightforward: "[S]uppression is not an appropriate remedy for a violation of Article 36 . . . ." *Sanchez-Llamas*, 126 S. Ct. at 2674.

Moreover, as in *Medellin*, Gomez argues that the ICJ's decision in *Avena*, especially when coupled with the President's Memorandum, requires that the evidence be suppressed. The Court, however, has closed that door as well: "[T]he *Avena* judgment is not automatically binding domestic law," *Medellin*, 128 S. Ct. at 1357, and the President's Memorandum exceeded his constitutional powers, *id*. at 1367-72. Though we "in no way disparage[] the importance of the Vienna Convention," *Sanchez-Llamas*, 126 S. Ct. at 2687, there is no reasonable debate as to the critical legal infirmities of Gomez's application.

VI.

Gomez offers sundry additional reasons why a COA should issue. He asserts that a venireman, Susan Campos, was improperly excluded based on her attitude toward the death penalty, contrary to *Witherspoon v. Illinois*, 391 U.S. 510 (1968). He contends that four other veniremen were excluded because they were opposed to capital punishment, a categorical exclusion improper under *Witherspoon*, and he avers that his attorney, by failing to oppose the exclusion

12

No. 04-70047

on *Witherspoon* grounds, was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). Likewise, Gomez argues that the sentencing court constitutionally erred in denying his request to inform the jury that if he was not sentenced to death, he would be required to serve a minimum of forty years in prison without parole, and further, and relatedly, that the district court misapplied the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288 (1989), on that point.

The district court got it right, and undebatably so. To explain why, we first state the question we are *not* called on to answer. The district court ruled that Gomez's *Witherspoon* claims for everyone but Campos were procedurally defaulted because they were not raised on direct appeal and that Gomez "ha[d] not shown, or even attempted to show, cause and prejudice for the default." As we review Gomez's application to this court relative to the four veniremen, we note that he does not mention that ruling, much less explain why it was wrong. Instead, he appears to argue only that his counsel's failure to oppose the exclusion of the venireman constituted a violation of *Washington*,[6] a similar—but narrower—objection to their exclusion.[7]

---

[6] For instance, Gomez argues that "[t]he question of counsel ineffectiveness . . . devolves into a question of whether the record . . . reasonably supports a conclusion that these venire-members were proven to be challengeable for cause" and that because there was a *Witherspoon* violation, "[i]t follows that defense counsel's failure to oppose their exclusion fell below objective norms for the competent performance of counsel in capital cases . . . ." There is authority under Texas law that "the failure to specify in objections that a juror's exclusion was inconsistent with *Witherspoon* waives any such error on appeal." *Carter v. State*, 717 S.W.2d 60, 76 (Tex. Crim. App. 1986). This might explain why Gomez, who did not object to these veniremen at trial, argued on appeal that his trial counsel violated *Washington* by failing to object based on *Witherspoon* but nonetheless failed to exhaust *Witherspoon* directly.

[7] We also do not address the sixth issue listed in Gomez's statement of issues, which is whether the Eighth Amendment's Cruel and Unusual Punishment Clause or the Fourteenth Amendment's Due Process Clause is implicated here. Gomez fails to argue that issue in his brief, so we do not consider it. *See, e.g., L&A Contracting Co. v. S. Concrete Serv.*, 17 F.3d 106, 113 (5th Cir. 1994).

No. 04-70047

## A.

Concerning the claim as it relates to Campos, under *Witherspoon* "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. But,

> nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.* at 522 n.21.

In *Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985) (internal citations and quotations omitted), the Court amplified this reservation by holding that the

> standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [And] this is why deference must be paid to the trial judge who sees and hears the juror.

14

No. 04-70047

In *Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007), the Court reemphasized the importance of deferring to the trial court under *Witherspoon*, explaining that "in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts;" where federal courts do not afford this deference, they "fail[] to respect the limited role of federal habeas relief in this area prescribed by Congress and by our cases." The Court expressly reaffirmed *Witt*, acknowledging that "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve [the question] in favor of the State." *Id.* at 2223 (citing *Witt*, 469 U.S. at 434).

Campos, along with the other veniremen, was given a questionnaire on which she agreed with statements such as "[c]apital punishment has never been effective in preventing crime," "I do not believe in capital punishment under any circumstances," "[c]apital punishment is not necessary in modern civilization," and the death penalty "is a disgrace to civilized society." Though she did not agree that capital punishment "should be abolished," she did agree that "[c]apital punishment is justified only for premeditated murder." She disagreed that "[c]apital punishment is just and necessary" and that "[w]e must have [it] for [some] crimes." She also checked the statement that "I cannot vote to assess the death penalty under any circumstances."

As part of her individual *voir dire*, the trial court tried to make sense of these statements. In a lengthy examination, Campos said that "I feel like I'm just not a person to judge anybody, and I believe that I can't accuse somebody of something that I don't believe in," and "I just don't believe in it." The court said that "you struck me as having two minds about the issue," and Campos said she was "[j]ust confused," and later "I'm confused about that. I mean, I'm just

No. 04-70047

against all that." Then she said "I just don't believe in the death penalty. I just don't feel it's right to kill anybody."

The next question was, "Is your feeling so strong—," to which Campos interjected, "Yes, sir." The court finished its question "—that you would be unable to answer the questions honestly, according to what the evidence showed?" Campos responded, "I'll be honest about it, but I just—I will answer questions, but I just feel very strongly about it. I don't believe in the death penalty at all." Later, the court asked, "[C]ould you ever vote—no matter what the evidence shows, that you could never vote for the death penalty?" She replied, "I wouldn't vote for the death penalty." A lawyer asked her, "Do you think that there is any crime, kind of crime, that deserves the death penalty?" Campos answered, "No, I don't." The court excused Campos for cause.

No reasonable jurist could find that a constitutional error was committed. Even on a stale printed page, Campos comes across as someone whose personal views would taint her ability fairly to answer questions that might affect whether to impose the death penalty. In fact, she said as much. When asked whether she could ever vote for death "no matter what the evidence shows," she forthrightly stated, "I wouldn't vote for the death penalty." When asked whether her feelings about capital punishment would "substantially impair [her] ability to answer questions" that might lead to the imposition of death, she said she was "confused about that" but also that she was "just against all that." These answers support the trial court's assessment.

But there is more: The trial judge was there and heard Campos. Her questionnaire showed dramatic vacillation and at least suggested that she could not follow the law. The *voir dire* cinched it. In light of the deference that is afforded trial courts under *Witt*, we deny a COA as to Campos.

Campos's opposition to the death penalty colored her ability to perform the duties of a juror in a capital case. Therefore, consistent with *Uttecht*, 127 S. Ct.

No. 04-70047

at 2230, "where, as here, there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion;" no reasonable jurist could conclude that the court unconstitutionally abused that discretion as to Campos.


### B.

Gomez argues this his trial counsel violated *Washington* by failing to object when four veniremen were excused based on their opposition to the death penalty. That claim, too, is unavailing.

To establish that a defense lawyer's representation fell below what is constitutionally acceptable, "petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness[, and] the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal citations and quotations omitted). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 534 (quoting *Washington*, 466 U.S. at 692).

A petitioner arguing that a *Washington* violation has occurred has a difficult task. "The measure of performance is highly deferential, calibrated to escape 'the distorting effect of hindsight.' We must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that the 'challenged action might be considered sound trial strategy.'" *Belyeu v. Scott*, 67 F.3d 535, 538 (5th Cir. 1995) (quoting *Washington*, 466 U.S. at 689).

No. 04-70047

Any reasonable jurist would agree with the district court that Gomez cannot show that the state trial court's decision to exclude these jurors was even wrong, much less that the decision was so obviously mistaken that Gomez's attorney's failure to object deprived him of the constitutional right to effective counsel. As the district court demonstrated at length in its excellent opinion, each of the four excused veniremen—Joan Carson, Maria Garcia, Luis Jaramillo, and Miguel Martinez—expressed at least some skepticism toward the death penalty in their written questionnaires. The trial court conducted individualized *voir dire*, and each of the would-be jurors stated additional things that cast doubt on his ability lawfully to discharge his duties. Each was excused for cause.

Carson presents the closest case, but hers is not even *that* close.[8] The transcript of her *voir dire* reflects the statements of a person struggling with the issue of capital punishment. For instance, though she had misgivings, she said that "if I were voting to keep the death penalty in Texas . . . I would probably vote to keep it." But she also said that she did not know whether she could serve on a jury that might be called on to impose the death penalty. The court then asked her, "Would your internal feelings about responsibility for causing the death penalty to be imposed materially substantially impair your ability to answer the questions—," to which Carson interjected, "Yes, sir." The court continued, "—which would determine the death penalty or life imprisonment. That's the question." Carson replied, "I would not vote for the death penalty." Gomez's lawyer did not object to her being excused for cause.

No reasonable jurist would conclude that this is enough to constitute a violation of *Washington*. Because Carson explicitly agreed that her "internal feel-

---

[8] The other veniremen left little doubt as to where they stood on the death penalty. Garcia agreed during *voir dire* that "there is no way [she] could ever vote the death penalty;" Jaramillo stated that he would "never vote for the death penalty;" and Martinez agreed that "no matter how horrible the crime," he would "still be opposed to capital punishment" and that he was "opposed to capital punishment under any circumstances."

No. 04-70047

ings about responsibility for causing the death penalty to be imposed materially substantially [would] impair [her] ability to answer the questions" such that she "would not vote for the death penalty," and especially because we are only addressing *Witherspoon* vis-à-vis *Washington* and not *Witherspoon* directly,[9] we decline to grant a COA.[10]

---

[9] Gomez mistakenly attempts to shoehorn *Witherspoon* into *Washington*. Although failure to argue *Witherspoon* adequately could sometimes suggest inadequate counsel, the mere fact that an attorney failed to make this particular *Witherspoon* argument does not mean, *per se*, that he fell short of the performance required by *Washington*. Instead, the violation of *Witherspoon* must be so egregious that it "fell below an objective standard of reasonableness" for the attorney to fail to object. *Wiggins*, 539 U.S. at 522. Professionally competent lawyers do not necessarily press every conceivable argument.

Gomez offers an interesting theory of *Witherspoon*—one that may conflict with *Morgan v. Illinois*, 504 U.S. 719 (1992), and one that he acknowledges that this court "has regularly resolved . . . contrary to Gomez's position"—that suggests that a venireman's mere statement that he will not vote to impose the death penalty is insufficient to satisfy *Witherspoon* because, in Texas, jurors do not vote for or against the death penalty, but instead only answer questions, which answers the trial court uses to impose sentence. This may be a correct statement of the law under *Witherspoon*; we take no firm position on that question, though we note that in *Adams v. Texas*, 448 U.S. 38, 46 (1980), the Court recognized that Texas jurors "characteristically know that affirmative answers to the questions will result in the automatic imposition of the death penalty," suggesting that the typical *Witherspoon* standard applies in Texas. *Washington*, however, is an inappropriate vehicle with which to make the argument.

A reasonable lawyer prepares reasonably for cases. That means that he conducts reasonable research, drafts reasonable briefs, directs reasonable investigation, and reasonably allocates time to those avenues with the most likelihood of success. Gomez's trial counsel's knowledge of the ins and outs of *Witherspoon*, as reflected by the record, shows that he satisfied *Washington*. He may not have made the argument that Gomez now presses, but this particular argument was not so obvious that any competent attorney would have leaped at the chance to employ it.

In regard (at least, but not exclusively) to Campos, the only would-be juror for which *Witherspoon* was properly raised, the trial court did more than ask whether she opposed the death penalty. It also asked whether her personal views on the death penalty would "substantially impair" her ability to perform her duty. The court decided, based in part on her answer, that she should be excused.

[10] The state habeas court conducted an evidentiary hearing on this issue and ruled, as a factual matter, that these four veniremen were "unalterably opposed to the death penalty under any circumstances, and that those prospective jurors' categorical opposition to the death
(continued...)

19

No. 04-70047

## C.

Gomez claims the trial court erred in failing to instruct the jury that, if he was not sentenced to death, he would be required to serve a minimum of forty years in prison without parole. Gomez argues that this violates the Compulsory Process Clause of the Sixth Amendment.[11] No reasonable jurist could agree with that assertion.

"[W]here a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant to inform the jury of his parole ineligibility, either by jury instruction or in arguments by counsel." *Shafer v. South Carolina*, 532 U.S. 36, 39 (2001) (internal citations and quotations omitted). But we have "consistently emphasized that a defendant can receive a jury instruction regarding parole ineligibility only if there exists a life-without-possibility-of-parole alternative to the death penalty—an option not available under Texas law." *Tigner v. Cockrell*, 264 F.3d 521, 525 (5th Cir. 2001).

In *Thacker v. Dretke*, 396 F.3d 607, 617 (5th Cir. 2005), we discussed whether the Compulsory Process Clause "guarantees [Texas capital defendants] the right to present testimony and argument relating to parole eligibility." For support, and to avoid the effects of the non-retroactivity principle announced in *Teague*, the petitioner in *Thacker*, as Gomez does here, cited *United States v. Scheffer*, 523 U.S. 303 (1998), involving the Compulsory Process Clause in the

---

[10] (...continued)
penalty and inability to vote to impose the death penalty under any circumstances were even more apparent . . . than were . . . Campos' attitudes and beliefs in that regard." There is a presumption under 28 U.S.C. § 2254(e)(1) that state habeas courts' factual determinations are correct, absent clear and convincing evidence to the contrary. *See Ortiz v. Quarterman*, 504 F.3d 492, 500-01 (5th Cir. 2007), *cert. denied*, 2008 U.S. LEXIS 3853 (U.S. May 12, 2008).

[11] "In all criminal prosecutions, the accused shall enjoy the right to . . . have compulsory process for obtaining witnesses in his favor . . . ." U.S. CONST. amend. VI.

20

No. 04-70047

context of "allegedly exculpatory polygraph evidence." *Thacker*, 396 F.3d at 617-18.

As did the petitioner in *Thacker*, Gomez argues that *Scheffer* establishes a broad general principle such that, if we were to find that the Compulsory Process Clause was violated, *Teague* would not apply.  Just as in *Thacker*, we reject that argument:

> *Scheffer* . . . merely holds that the exclusion of polygraph results is not disproportionate or arbitrary in light of a defendant's not unbridled right to present evidence in his defense. To hold that it extends to, and invalidates, all restrictions on discussion of parole eligibility would undoubtedly be a bold new step, not an "unremarkable" application of settled precedent. Thacker's Sixth Amendment argument, therefore, is so plainly barred by *Teague* that we cannot conceive that reasonable jurists would disagree.

*Id.* at 618.

Moreover, "[e]ven if Thacker's claim based on the Compulsory Process Clause claim were not barred by the non-retroactivity principle of *Teague*, its substance is insufficient for the issuance of a COA." *Id.*  Expressly likening this Compulsory Process argument to our due process precedents, we held that "it can hardly be said that the Texas Court of Criminal Appeals acted contrary to, or engaged in an unreasonable application of, federal law. . . . [W]e have explicitly rejected such an argument under the analogous due process framework, . . . [and] we [cannot] imagine that reasonable jurists could disagree." *Id.* at 619.

The application for a COA is DENIED.

A true copy
Attest:

Clerk, U. S. Court of Appeals, Fifth Circuit

By
Deputy

New Orleans, Louisiana